UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SUSAN M. ARCURI,

                                   Plaintiff,

                                                              6:15-CV-00798
v.
                                                              (DNH/TWD)
MAJOR KEVIN SCHOCH, BETTINA CARMEN,

                                   Defendants.
_____

APPEARANCES:

SUSAN M. ARCURI
Plaintiff, *pro se*
60 Pond Lane
Utica, New York 13501

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT AND RECOMMENDATION</u>

The Clerk has sent to the Court for review the *pro se* complaint in this employment

discrimination action pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101, *et seq*., as amended, brought against Defendants Major Kevin Schoch ("Schoch"),

Director of the Salvation Army Adult Rehabilitation Center in Syracuse, New York, and Bettina

Carmen ("Carmen"), Regional Store Manager    Salvation Army Adult Rehabilitation Thrift

Store,  (Dkt. No. 1.)  Also before the Court are Plaintiff's application for leave to proceed *in*

*forma pauperis* ("IFP application") (Dkt. No. 2), and motion for appointment of counsel.  (Dkt.

No. 3.)

## I.      IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).  After reviewing Plaintiff's IFP application, the Court finds that Plaintiff meets this standard.  Therefore, Plaintiff's IFP application (Dkt. No. 2) is granted.

## II.      LEGAL STANDARDS FOR INITIAL REVIEW

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua*

*sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III.    PLAINTIFF'S COMPLAINT

Plaintiff alleges that Defendants Schoch and Carmen discriminated and retaliated against her and created a hostile work environment in violation of the ADA.  (Dkt. No. 1 at ¶¶ 6-7.)  The body of Plaintiff's complaint is devoid of factual allegations and refers the reader instead to attachments to the complaint, including a statement submitted by her in support of her U.S. Equal Employment Opportunity Commission ("EEOC") complaint.  *Id*. at ¶¶ 8-9.

According to the March 25, 2014, statement, Plaintiff was hired by the Salvation Army to fill the vacancy of Manager at the Salvation Army Adult Rehabilitation Thrift Store in Ilion, New York ("Ilion Thrift Store").  *Id.* at 6.  Plaintiff was engaged in training for the position from March 10, 2014, to March 15, 2014, at the Rome, New York Thrift Store ("Rome Thrift Store").  Her training was done under the supervision of Defendant Carmen and Rome Thrift Store on-site manager Cassandra Witzigman ("Witzigman").  *Id*.

While training at the Rome Thrift Store, Plaintiff worked with Witzigman, Assistant Store Manager, Christopher Vetter ("Vetter"), Senior Sales Associate, Brian Harrer ("Harrer"), and other subordinates, under the supervision of Carmen.  *Id*.  Plaintiff spent the first day of training, March 10, 2014, with Witzigman completing tasks on an orientation process list, discussing policies and procedures, and touring the store and meeting employees with Vetter.  On the second day, March 11, 2014, Plaintiff was introduced to the Employee Manual and spent time in the production room with Witzigman asking questions about the handling of donations; sanitation of donations, including whether it was done in a room with good ventilation (a concern because of her asthma) and what chemical solutions were used; if gloves were worn when handling donations, and if it was legal to re-sell used undergarments.  *Id*. at 6-7.

4

Witzigman told Plaintiff that the Ilion Thrift Store where Plaintiff would be working sanitized donations, including mattresses, on the store sales floor. *Id*. at 7. Plaintiff and Witzigman discussed how that would be problematic because of Plaintiff's asthmatic condition, with Plaintiff suggesting that spraying be done outside and that reasonable accommodations be made for her asthma during inclement weather, such as alerting her when spraying was being done in the process room. *Id*.

Plaintiff and Witzigman then began processing items, and Witzigman handed Plaintiff a mattress cover, which she was to price and hang for the sale floor. *Id*. When she unraveled it, Plaintiff noted that it was completely soiled with dried urine. *Id*. She quickly let go of the cover and asked for gloves. *Id*. She was given a very thin pair of plastic gloves that appeared vulnerable to rips and tears. *Id*. Plaintiff then began processing shoes, using ammonia and water to rid them of odors. *Id*.

On March 14, 2014, Plaintiff worked with Carmen in Witzigman's absence, and the two worked side-by-side processing used shoes and using guidelines for pricing, with Plaintiff's pricing being largely in sync with Carmen's. *Id*. When finished, Plaintiff was instructed by Carmen to read the Guide to Thrift Store and Donation Center Operations and Supplemental Guide for Supervisors, Managers, Assistant Managers and Senior Sales Associates. *Id.* at 7-8. Plaintiff took the opportunity to ask Carmen about contradictory policies and procedures and again addressed sanitary conditions and the handling of donations that might be tainted by bodily fluids, since she had not received a satisfactory answer to the question from Witzigman. *Id.* at 8. Carmen dismissed the inquiry and turned Plaintiff over to Vetter as she had to leave. *Id*.

The following day, Plaintiff immediately noticed a difference in Carmen's disposition.

*Id.* Harrer was assigned by Carmen to accompany Plaintiff into the production room where he assigned her the task of sorting and pricing four bins of used footwear and left to speak with Carmen. *Id.* Plaintiff asked a co-worker if gloves were available, and she was directed to a box of small latex gloves that barely fit her hands. *Id.* The co-worker suggested Plaintiff put on a pair of mittens that had been donated. *Id.*

When Plaintiff completed her assigned task, she knocked on Carmen's door to let her know she was going to do other tasks, and Harrer responded in a condescending tone that he and Carmen were not finished talking, and Plaintiff should continue with other work. *Id.* Carmen again seemed a bit distant. *Id.* Plaintiff claims that Harrer's attitude, including demeaning responses to Plaintiff, created a hostile work place, and that Carmen's nonfeasance contributed to the hostile work environment. *Id.*

Toward the end of the work shift on her last day of training, Plaintiff worked with Witzigman, thanked everyone for their input during her training, and told Witzigman she would probably be calling her from Ilion if she had questions. *Id.* Although Witzigman wished Plaintiff luck, Plaintiff believes in hindsight that she was aware of Plaintiff's pending termination. *Id.*

Plaintiff reported to the Ilion store on March 18, 2014, and was welcomed by the assistant manager, who introduced her to employees, telling them Plaintiff was wonderful, and they would love having her as the new manager. *Id.* at 9. When Carmen arrived later to deal with shop lifting by an employee, she informed Plaintiff she needed to speak with her. *Id.* Carmen told Plaintiff that they were not comfortable with her remaining employed with them since she was "skittish" about handling donated items. *Id.* Carmen informed Plaintiff that based upon the

manager's report of her training, Defendant Schoch did not believe Plaintiff to be suitable for the position of manager of the Ilion Thrift Store. *Id*. Plaintiff believes that her employment was terminated as a result of her having expressed concern about handling donated items and requesting gloves, as well as for stating that she would have all spraying done outside the Ilion store when she became manager because of her asthma. *Id.*

Plaintiff filed a complaint with the EEOC shortly after her termination, and the EEOC issued a right-to-sue letter on March 31, 2015. *Id.* at 10. Plaintiff alleges receipt of the right to sue letter on April 3, 2015. *Id*. at ¶ 11. Her Complaint was presented for filing on June 30, 2015.[1] *Id*.

## IV.    ANALYSIS

### A.    Employment Discrimination Claim under Title I of the ADA

Under Title I of the ADA, an employer cannot "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To plead a Title I violation, a plaintiff must allege that (1) the defendant is subject to the ADA; (2) plaintiff is disabled within the meaning of the statute or perceived to be so by his or her employer; (3) he or she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (4) he or she was subject to an adverse employment action because of his or her disability. *See Brady v. Wal-mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

The ADA defines a disabled individual as one who has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a

---

[1] Plaintiff, as required, filed this lawsuit under the ADA within ninety days of her receipt of the EEOC right-to-sue letter. See 42 U.S.C. § 12117(a); 42 U.S.C. ¶ 2000e-5(f)(1); *see also Tiberio v. Allergy Asthma Immun. of Roch*., 664 F.3d 35, 37 (2d Cir. 2011).

record of such impairment; or (C) [is] regarded as having such impairment."  42 U.S.C.

§ 12102(1).  Major life activities include but are not limited to caring for oneself, performing

manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking,

breathing, learning, reading, concentrating, thinking, communicating, and working.  42 U.S.C.

§ 12102(2)(A).  A major life activity also includes "the operation of a major bodily function."  *Id*.

Allegations of disability advanced under § 12102(1)(A) require of the plaintiff: "(1) a showing

that he [or she] suffers from a physical or mental impairment; (2) identification of the

supposedly-impaired major life activity; and (3) demonstration of substantial limitation of that

activity."[2]  *Troeger v. Ellenville Central School Dist.*, No. 1:10-cv-718 (GLS/DRH), 2012 WL

3643839, at * 1, 2012 U.S. Dist. LEXIS 119512, at * 3 (N.D.N.Y. Aug. 23, 2012), *aff'd*, 534 F.

App'x 848 (2d Cir. 2013).[3]

### B.    Retaliation Claim Under the ADA

Plaintiff claims that Defendants retaliated against her for expressing concerns about

handling the donated items and requesting protective gloves, and for stating that she would have

spraying of items done outside due to her asthma and inadequate ventilation inside the store.

(Dkt. No. 1 at ¶ 6 and 9.)  In order to state a claim for retaliation under the ADA, a plaintiff must

allege facts showing that: "(1) he [or she] engaged in an activity protected by the ADA; (2) the

employer was aware of this activity; (3) the employer took adverse employment action against

---

[2]  The Court finds that Plaintiff has failed to allege facts adequately describing the severity of her asthma and the limitations it imposes on her major life activities, a deficiency that should be corrected in the event an amended complaint is filed in the action.

[3]  Copies of all unpublished decisions cited herein will be provided to Plaintiff pursuant to *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

him [or her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). "Protected activity includes not only the filing of formal charges of discrimination, but also the informal protests of an employer's discriminatory practice such as, 'making complaints to management,' and the request for a reasonable accommodation." *Lupe v. Shineski*, No. 1:10-CV-198 (MAD/ATB), 2012 WL 3685954, at * 19, 2012 U.S. Dist. LEXIS 120508, at * 60 (N.D.N.Y. Aug. 24, 2012) (citation and internal quotation marks omitted); *see also Sumner v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990) (protected activities include "making complaints to management.").

### C. Individual Liability

Plaintiff has sued Schoch and Carmen, individual employees of her former employer, the Salvation Army. In *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010), the Second Circuit held that there is no individual liability under the retaliation provision of the ADA. Although the Second Circuit has yet to explicitly address whether there is individual liability under Title I of the ADA, many district courts in this circuit, as well as other circuit courts, have held that individual defendants may not be held personally liable for alleged violations of Title I of the ADA. *See, e.g., Castro v. City of New York*, 24 F.Supp. 3d 250, 259 (E.D.N.Y. 2014) (acknowledging that many courts have concluded that the bar to individual liability in *Spiegel* extends to individual liability claims under Title I of the ADA and dismissing claims against individuals); *Doe v. Major Model Mgmt, Inc.*, No. 11 Civ. 6182(KBF), 2012 WL 763556, at * 7,

2012 U.S. Dist. LEXIS 32064, at * 19 (S.D.N.Y. Mar. 9, 2012) ("The ADA applies to employers; it does not confer individual liability."); *Carlson v. Geneva City School Dist.*, 679 F.Supp. 2d 355, 378 (W.D.N.Y. 2010) (actions against defendants in their individual capacities are not permitted under Title I of the ADA); *Fox v. State University of New York*, 497 F.Supp. 2d 446, 449 (E.D.N.Y. 2007) (there is no individual liability under Title I of the ADA) (citing *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *see also Silk v. City of Chicago,* 194 F.3d 788 (7th Cir. 1999) (supervisor cannot be held liable in his individual capacity in employment discrimination case under the ADA); *Román-Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 52 (1st Cir. 2011) (Title I of the ADA addresses only the conduct of employers and does not impose liability on co-workers).  Therefore, Plaintiff's Complaint fails to state a claim against Schoch and Carmen under the ADA.

Plaintiff has not named her former employer, the Salvation Army, against whom she filed her EEOC complaint, as a defendant in this lawsuit.  (Dkt. No. at 6.)  Therefore, the Court recommends that Plaintiff be granted thirty days from the date the District Court files its order on this Court's Report-Recommendation within which to file an amended complaint naming the Salvation Army.[4]  The Court further recommends that upon the expiration of the thirty days granted Plaintiff to file an amended complaint, the action be dismissed with prejudice as against

---

[4]  The Court recommends that in the event Plaintiff is granted leave to file an amended complaint against the Salvation Army, she be cautioned that any additional pleadings must comply with the requirements of Federal Rule of Civil Procedure 8; a pleading must contain "a short and plain statement of the claim," and "[e]ach allegation must be simple, concise, and direct."  Fed.R.Civ.P. 8(a)(2), (d)(1).  In addition, Plaintiff should be instructed to consider the requisite elements of claims under the ADA as discussed herein in drafting any amended complaint in this action.

Schoch and Carmen, whether or not Plaintiff has filed an amended complaint.

### III.    MOTION FOR APPOINTMENT OF COUNSEL

Plaintiff has moved for appointment of counsel.  (Dkt. No. 3.)  However, a more fully

developed record will be necessary before the Court can assess whether counsel should be

appointed.  *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997).

**ACCORDINGLY**, it is hereby

**ORDERED**, that Plaintiff's IFP application (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's application for appointment of counsel (Dkt. No. 3) is

**DENIED** without prejudice; and it is

**RECOMMENDED**, that Plaintiff be granted leave to file an amended complaint naming

the Salvation Army as a defendant within thirty days from the filing of an order by the District

Court on this Court's Report-Recommendation; and it is further

**RECOMMENDED**, that Plaintiff be cautioned that any additional pleadings must

comply with the requirements of Federal Rule of Civil Procedure 8; and it is further

**RECOMMENDED**, that at the expiration of the thirty days granted Plaintiff to file an

amended complaint, the action be dismissed with prejudice against Defendants Schoch and

Carmen, whether or not Plaintiff has filed an amended complaint; and it is

**ORDERED**, that in the event Plaintiff files an amended complaint, the Clerk submit the

amended complaint to this Court for initial review pursuant to 28 U.S.C. § 1915(e); and it is

further

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of all unpublished decisions cited herein in accordance with

*Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: July 2, 2015
Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
John DOE, Plaintiff,
v.
MAJOR MODEL MANAGEMENT INC., Katia
Sherman, Jason Kanner, and Guido Dolci, Defendants.

No. 11 Civ. 6182(KBF).
March 9, 2012.

*MEMORANDUM OPINION & ORDER*
KATHERINE B. FORREST, District Judge.

**\*1** On September 2, 2011, plaintiff brought claims for discrimination and retaliation under the American with Disabilities Act ("ADA"), 42 U.S.C § 12101 *et seq.,* and state and city law analogues, N.Y. Exec. Law § 290 *et seq.,* and N.Y. City Admin. Code § 8–107, against his former employer, Major Model Management Inc. ("Major"), his direct supervisor at Major, Jason Kanner (who has since left Major), the President and Chief Executive Officer of Major, Katia Sherman, and Major's owner, Guido Dolci (collectively, "defendants"). Doe claims that defendants failed to provide reasonable accommodation for his disability—*i.e.,* his diagnosis with HIV—and retaliated against him. This Court cannot be guided by the sympathy that plaintiff's diagnosis evokes, but rather by whether an employer's response to that condition, under all of the facts and circumstances in the record, demonstrates that the employer violated the law. On the record here, the Court finds that plaintiff does not have a valid cause of action for discrimination and retaliation.

Plaintiff has proffered insufficient evidence to raise a triable issue of fact as to whether he can establish a prima facie case of discrimination or retaliation under federal, state, or city laws. In addition, Major has proffered a legitimate, non-discriminatory reason for plaintiff's termination—namely, the elimination of plaintiff's position when defendant Kanner, the person for whom plaintiff was hired to work, abruptly left the firm, eliminating the necessity for plaintiff's position—and other positions in Major's Men's Division—entirely.

Defendants have moved pursuant to Fed.R.Civ.P. 12(b)(6) and 56 to dismiss the action or for summary judgment. For the reasons discussed below, defendants' motion for summary judgment is GRANTED.

FACTUAL BACKGROUND

The undisputed facts set forth below are merely a summary of the purported "facts" before the Court. Such summarization was necessary to decipher plaintiff's claims—and whether they have any merit. This Court uses the word "summarized" intentionally: the papers in support of and in opposition to defendants' summary judgment motion do not distill this case to the critical elements. In particular, plaintiff's papers contain a prolonged recitation of largely irrelevant events which have nothing to do whether defendants have engaged in actionable wrongdoing.

More importantly, neither party has submitted the required Rule 56.1 statement of undisputed facts. *See* Rule 56.1, Local Civil Rules, S.D.N.Y. Although the Court could deny defendants' motion on that basis, *T.Y. v. New York City Dep't of Educ.,* 584 F.3d 412, 412 (2d Cir.2009), the Court has exercised its discretion in this instance and decided to overlook both parties' failure to comply with this Court's Local Rules. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001). Instead, the Court conducted an

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**

"assiduous review of the record," *id.* (quotations omitted), and finds the undisputed facts to be as follows.[FN1]

> FN1. The Court independently reviewed the countless emails and letters (many of them duplicates) spanning from September 21, 2009 through October 2010 attached as Exhibit B to the Attorney Affidavit of Kenneth R. Maguire in Support of Defendants' Converted Rule 56(b) Motion ("Maguire Aff.") (Dkt. No. 30). None of those emails was identified specifically for the proposition(s) they allegedly support.

> In addition, the Maguire Affidavit also contains factual averments of which Mr. Maguire could not possibly have had first-hand knowledge. (*See* Maguire Aff. ¶¶ 3–20.) Accordingly, the Court does not credit those assertions—although it need not—in rendering a decision on the instant motion.

> The Court likewise does not credit the self-serving assertions in plaintiff's affidavit that have no record support. *See Bell-South Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn.,* 77 F.3d 603, 615 (2d Cir.1996).

**\*2** Plaintiff was hired on a part-time basis by defendant Major at the beginning of September 2009. He had a five-hour daily commute (round trip) to and from his home in Pennsylvania to New York City. This commute was of plaintiff's own choosing. (*See* Affidavit of John Doe ("Doe Aff.") (Dkt. No. 31–2) ¶¶ 6, 8; Affidavit of Katia Sherman ("Sherman Aff.") (Dkt. No. 30–7) ¶¶ 5, 6; *see also* Sherman Aff. ¶ 11.) In or about the end of September 2009, Major offered plaintiff a full-time position as Kanner's assistant. (Doe Aff. ¶ 6; Sherman Aff. ¶ 6.) After accepting that

offer (*see* Doe Aff. Ex. D), from September 29, 2009 through the end of December 2009, regardless of any agreement that plaintiff could arrive at work at 10:00 a.m. (*see* Doe Aff. ¶ 6 & Ex. D), it is uncontroverted that plaintiff frequently arrived substantially after 10:00 a.m. or did not come into the office altogether based upon problems with his commute. (*See, e.g.,* Attorney Aff. of Kenneth Maguire ("Maguire Aff.") (Dkt. No. 30) Ex. B (various emails from plaintiff to Kanner evidencing problems with plaintiff's train commute and stating either that he would be late or not be able to make it in at all); *see also* Aff. of Jason Kanner ("Kanner Aff.") (Dkt. No. 30–8) ¶ 8.) During the September to December 2009 time period, the record shows that plaintiff made errors in the course of his work. (*See, e.g.,* Maguire Aff. Ex. B (Nov. 30, 2009 4:56 p.m. email from Doe to Kanner ("I apologize for dropping the ball on that. Is there anything I can do to amend this?")).)

On January 1, 2010, plaintiff resigned from Major, citing his desire to continue his education, his lack of financial means to move to New York, and his inability to "keep[ ] up [his] drive in a 'sink or swim' type atmosphere," as well as his disagreement "with the philosophy in [Major's] Men's Division," and the fact that it was "not a place" in which he saw "the potential for growth." (Doe Aff. ¶ 8; Sherman Aff. ¶ 6; Maguire Aff. Ex. B (Jan. 1, 2010, 2:46 p.m. email from plaintiff to Sherman (SM000133)).) Later that month, plaintiff was in contact with a Major employee, Tom Winslow (who initiated the contact is disputed, but ultimately immaterial), regarding the possibility of returning to Major for purposes of assisting with Fashion Week. (Doe Aff. ¶ 9; Sherman Aff. ¶ 7.) Major rehired plaintiff as of February 1, 2010 in a full-time capacity as Kanner's assistant. (Sherman Aff. ¶¶ 7, 11.)[FN2]

> FN2. The October 1, 2011 letter from Major to plaintiff regarding his unpaid leave of absence states that plaintiff was hired on a part-time basis from February through March

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
(Cite as: 2012 WL 763556 (S.D.N.Y.))

and that became a full-time salaried employee in April. (Sherman Aff. Ex. B at 1 (SM000023).) That discrepancy in Sherman's affidavit, however, does not change the outcome of the Court's decision.

In March 2010, plaintiff began experiencing health problems and inquired of Sherman regarding his health benefits, at which time Sherman informed him that Major was switching insurance companies and he would be provided with insurance by April. (Doe Aff. ¶ 12.) As of April 22, 2010, plaintiff was informed that he had full health insurance benefits from Major. (Maguire Aff. Ex. B (Apr. 22, 2010 email exchange between plaintiff and Kanner (Kanner: "Katia said ur [*sic* ] insurance is up and running," plaintiff: "That's amazing about my insurance. I'm making a doctor's appointment tomorrow for Saturday.")).)

**\*3** On May 3, 2010, plaintiff was diagnosed with HIV and informed defendants Sherman and Kanner of the diagnosis that same day. (Doe Aff. ¶ 16; Sherman Aff. ¶ 13; Kanner Aff. ¶ 12.) By plaintiff's own account, upon learning of his diagnosis, Sherman was "sympathetic" and told plaintiff "to take as much time as [he] needed away from work." (Doe Aff. ¶ 16.) On May 4, 2010, the diagnosis was confirmed. (Doe Aff. ¶ 17.) Upon relaying that to Sherman, he asked if Major would provide a car service "to shuttle [plaintiff's] parents to the train statement from the hospital at night, and to use for [plaintiff's] Dr's [*sic* ] appointments." Sherman agreed—and arranged for the car service for plaintiff and his family on 13 occasions. (Doe Aff. ¶ 17; Sherman Aff. ¶ 13.)

Prior to his diagnosis, during the period from February 1, 2010 through May 4, 2010, plaintiff took a number of sick days (according to defendants' count, 11) and committed serious errors in his work (again according to defendants, six). (Sherman Aff. ¶ 12; *see also, e.g.,* Maguire Aff Ex. B (Feb. 5, 2010 1:37 p.m. email from plaintiff to Kanner ("Sorry. I fixed it.");

Feb. 10, 2010 email exchange between plaintiff and Kanner (Kanner: "not good kiddo ... I understand but to me it's not [*sic* ] given til you here [*sic* ] form [*sic* ] them," plaintiff: "I apologize and will take the fall for that."); Feb. 10, 2010 6:14 a.m. email exchange between plaintiff and Kanner regarding train delays and not coming into the office; Feb. 22, 2010 3:56 p.m. email exchange between plaintiff and Kanner regarding an error in plaintiff's work to which he responded, "I see, now. I apologize."); Feb. 23, 2010 1:24 p.m. email from plaintiff to Kanner ("didn't mean to send that lightbox 'Swim Suit Shoot' "); Feb. 26, 2010 email exchange between plaintiff and Kanner re train delays and plaintiff not coming in to work given the length of the delays; Mar. 15–16, 2010 email exchange between plaintiff and Kanner re train delays and possibility of not coming in; Mar. 24, 2010 5:29 a.m. email from plaintiff to Kanner re taking a sick day).) Notwithstanding Major's policy that its "employees are allocated five(5) sick or personal days for each calendar year of their employment" (Sherman Aff. Ex. B (SM00023); *see also* Reply Aff. of Katia Sherman ("Sherman Reply Aff.") (Dkt. No. 32–1) Ex. A), plaintiff was paid for a substantial portion of the sick days he took in 2010 (Sherman Reply Aff. at 4 & Ex. B; *see also* Sherman Aff. ¶ 13).

Subsequent to his diagnosis, plaintiff took sick leave from May 4, 2010 through June 21, 2010, during which time Major paid for a car service for plaintiff and/or his family at least 13 times. (Sherman Aff. ¶¶ 13–14; *see also* Doe Aff. ¶¶ 17–31; Maguire Aff. Ex. D (copies of vouchers).) During that time, Major "increased" plaintiff's health insurance "to be 100% employer paid," and paid him his full salary "for most of th[at] period." (Sherman Aff. Ex. B.) On June 21, 2010, plaintiff returned to work in his original position as Kanner's full-time assistant. (Sherman Aff. ¶ 14.)

**\*4** Upon plaintiff's return to work in June 2010, "plaintiff required more income to reach the level for full health insurance and to cover his ongoing expenses," which Major accommodated by "in-

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**

crease[ing] plaintiff's salary so that he would qualify for full prescription drugs benefits." (Sherman Aff. ¶ 14.) In July 2010, Major gave plaintiff a $1,000 advance on his pay. (Sherman Aff. ¶ 16; Sherman Reply Aff. at 4.)

Plaintiff returned to work for some period of days between June and August 2010, during which time he again committed errors. (*See, e.g.,* Maguire Aff. Ex. B (July 12, 2010 4:27 p.m. email from plaintiff to Kanner ("OMG. I'm sorry. I really don't make blatant mistakes like that"); July 23, 2010 email exchange between plaintiff and Kanner regarding plaintiff forgetting to change confirmations in a booking chart).)

On September 10, 2010, plaintiff committed another, this time "serious," error at work—which plaintiff concedes occurred. (Sherman Aff. ¶ 17; Kanner Aff. ¶ 15; Doe Aff. ¶ 34; *see also* Maguire Aff. Ex. B (Sept. 10, 2010 email exchange re errors in booking models).) There was an "altercation" between plaintiff and Kanner on September 10, the result of which is disputed (*i.e.,* whether plaintiff told Kanner "to go 'F' himself" and verbally resigned from his position or was told to "get out of the office"). (Doe Aff. ¶ 41; Kanner Aff. ¶ 15; Sherman Aff. 17 & Ex. A.) At the end of the day, Kanner sent plaintiff an email saying that he did not need to come in to work the next day, but that plaintiff would need to meet with Sherman and himself the following Monday. (Doe Aff. ¶ 34; Maguire Aff. Ex. B (Sept. 10, 2010 6:25 p.m. email).)

At the September 13, 2010 meeting among plaintiff, Sherman and Kanner, Kanner asked, "Where do we go from here?," at which time, plaintiff asked to take temporary disability. (Doe Aff. ¶ 35.) Sherman explained that if that was the route plaintiff wished to take, a more favorable financial option would be being a "firing" in which plaintiff was given a "generous severance" and could collect unemployment since temporary disability would not be financially advantageous, but would be able to return to Major upon

regaining his health. (*Id.*) After various back and forth, Kanner offered plaintiff a "deal" in which plaintiff would be paid his fully salary from September 20, 2010 to January 1, 2011 with health benefits extending until March 2011. (Doe Aff. ¶ 38.) On September 23, 2011, plaintiff called Kanner and agreed to "take the deal," as long as he would be able to return to Major once he was well. (Doe Aff. ¶ 40.)

On September 24, defendant Sherman emailed plaintiff a letter dated September 23, accepting plaintiff's resignation, but offering him an opportunity to return to work for Kanner "should [he] wish to come back to work immediately." (Doe Aff. ¶ 41 & Ex. K; Sherman Aff. Ex. A.) On September 24, plaintiff indicated to Kanner that he would be returning to work on Monday, September 27. (Doe Aff. ¶ 42 & Ex. L; *see also* Sherman Aff. ¶ 19.) Sherman sent a follow-up email on September 24 to plaintiff stating that she would see him at 10:00 a.m. on Monday, September 27, to discuss "hours/divisions and so on," and assured him not to worry. (Doe Aff. Ex. N.)

**\*5** On September 26, plaintiff emailed Sherman to let her know that he had become ill and would be unable to return to work on September 27. (Doe Aff. ¶ 43 & Ex. M; Sherman Aff. ¶ 19.) Sherman responded: "Get well and keep me posted." (Doe Aff. Ex. O.) Two days later Sherman requested that plaintiff call John Sherman (in Major's legal department), at a time convenient for plaintiff. (Doe Aff. Ex. R.) On September 29, John Sherman initiated a call to plaintiff in which John Sherman informed plaintiff that Major would pay him his full salary for six weeks commencing on October 4, 2010, that his health insurance coverage would remain through the end of the 2010 calendar year, and that he could take an unpaid leave of absence during which he could claim disability or return to work if permitted by his doctor. (Doe Aff. ¶ 48; Sherman Aff. Ex. B.)

Sherman sent a letter to plaintiff memorializing their September 29 conversation. (Sherman Aff. Ex.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**

B; Doe Aff. ¶ 49.) Plaintiff responded to the email, "I appreciate you thinking of me, as I have received the attached letter. I will meet with my doctor tomorrow ... as [*sic* ] we shall determine the length of time for my absence." (Doe Aff. Ex. R.) Plaintiff did not dispute any of the facts of his employment at Major laid out in the October 1 letter upon receipt. (*See id.*) On October 7, plaintiff informed Major that his doctor expected him to be able to "medically return to work in six weeks." (Doe Aff. ¶ 50 & Ex. U.)

On October 27, 2010, plaintiff's supervisor, Kanner, left Major—with Major's "understanding and consent"—to start a competing agency, and took a substantial portion of Major's business with him. (Sherman Aff. ¶ 22; Kanner Aff. ¶ 20.) Plaintiff, whose only position at Major had been as Kanner's assistant,[FN3] no longer had a position after Kanner left the firm—*i.e.,* plaintiff's "position had essentially evaporated." (Sherman Aff. ¶ 23.)

> [FN3]. Plaintiff asserts that he worked as a junior booker from February 19, 2009 through his diagnosis in May as a junior booker who was not only supervised by Kanner, but also by Tom Winslow, another Major employee. (Doe Aff. ¶ 11.) There is nothing in the record to support that assertion—the uncontroverted evidence shows that plaintiff worked exclusively for Kanner during his time at Major, although had contact with other employees—and the Sherman Reply Affidavit directly contradicts that assertion (*see* Sherman Reply Aff. at 5). Further, subsequent to his diagnosis, there is no dispute that plaintiff worked exclusively for Kanner.

The next day, Sherman sent plaintiff a letter on Major's behalf notifying him of Kanner's departure and that as a result of the "reorganization and downsizing," "several positions, including [his], ha[d] been eliminated." (Doe Aff. Ex. V; *see also* Sherman Aff. ¶

24.) [FN4] The letter reiterated that Major understood that the "news may come at a bad time," that they "wish[ed] [they] were not in this position," but that "during these difficult economic times [they] ha[d] little recourse." (Doe Aff. Ex. V.) Major, however, stated that despite the elimination of plaintiff's position, the "accommodations set forth in our letter to you dated October 1, 2010 concerning a gratis compensation package and health insurance coverage during your unpaid leave of absence will remain in effect as outlined"—*i.e.,* plaintiff would continue to be paid his full salary through November 15, 2010, and would retain health insurance through the end of 2010. (*Id.;* Sherman Aff. ¶ 24.)

> [FN4]. Plaintiff also emailed a copy of the letter on November 2, 2010, with a text of the email reading, "You probably already know that Jason and Andrew left Major." (Doe Aff. Ex. W at 2.)
>
> Plaintiff's assertion that Major had made three new hires since October 1, 2010 (Doe Aff. ¶ 52) is completely without support in the record.

On November 2, 2010, plaintiff responded to the letter sent via email that same day stating that he was "confused as to why [his] specific position had been eliminated," but thanked Sherman "for my time of employment and for everything you've assisted me with," and asked if he could use Sherman "as a reference for future employment opportunities." (Doe Aff. Ex. W.)

### PROCEDURAL HISTORY

**\*6** On November 22, 2011, defendants notified plaintiff that they intended to move to dismiss this case under Fed.R.Civ.P. 12(b) (6) or 56. (Maguire Aff. Ex. E.) Defendants filed the instant Rule 56 motion on December 16, 2011 (*see* Dkt. No. 19), and the motion was fully briefed as of January 20, 2012 (*see* Dkt. Nos.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**

31, 32).

Although plaintiff has asserted that the motion is premature because discovery has yet to occur, he has not sought specific discovery prior to responding to this motion, has not made a motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, and has even failed to set forth any particular discovery that he would take if provided an opportunity to do so. Accordingly, his argument as to prematurity fails. *See Di Benedetto v. Pan Am World Serv., Inc.,* 359 F.3d 627, 630 (2d Cir.2004) ("The failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." (quotation marks and alterations omitted)).

DISCUSSION

I. STANDARD OF REVIEW

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making that determination, the court must "construe all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir.2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of mate-

rial fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citation omitted). In addition, self-serving affidavits, sitting alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. *See BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn.,* 77 F.3d 603, 615 (2d Cir.1996). Only disputes over material facts—*i.e.,* "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

II. THE ADA CLAIM

**\*7** Plaintiff has brought both discrimination and retaliation claims under the ADA, 42 U.S.C. §§ 12112(a), 12203(a). (Compl.¶¶ 98–103.) The ADA makes it unlawful for an employer, with respect to hiring or discharge, to "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). In addition, the ADA prohibits employers from retaliating against an individual for "oppos[ing] any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a). The ADA applies to employers: it does not confer individual liability. *Spiegel v. Schulmann,* 604 F.3d 72, 79 (2d Cir.2010). For that reason, the claims against the individual defendants here—*i.e.,* Sherman, Kanner, and Dolci—must be dismissed with prejudice. *Id.* However, the Court still must consider whether plaintiff has made out an ADA claim against Major.

A. *Discrimination Under the ADA*

To establish a *prima facie* discrimination claim under the ADA, Doe must establish sufficient facts showing that: (a) he is disabled within the meaning of the Act (this is not a point in dispute here); (b) Major is

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**

subject to the ADA and had notice of his disability (also not a point of contention); (c) he was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; and (d) he was fired because of his disability. *See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149–50 (2d Cir.1998).*

Assuming plaintiff can make out a prima facie case (and this Court does not find that plaintiff here can), the burden would shift to Major under the analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to show a legitimate, nondiscriminatory purpose for its allegedly adverse action (*i.e.,* plaintiff's firing). *See Raytheon Co. v. Hernandez,* 540 U.S. 44, 49–50, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003); *Reg' 1 Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48–49 (2d Cir.2002).

Here, plaintiff fails to (i) raise triable issues with respect to the third and fourth elements of the prima facie case, and (ii) rebut the legitimate, non-discriminatory rationale proffered by Major for plaintiff October 2011 termination.

### i. Prima Facie Case

Plaintiff has not offered sufficient evidence to create a triable issue of fact regarding whether he was qualified to perform his position with or without reasonable accommodation, or that he was fired because of his diagnosis with HIV.

First, the amount of leave that plaintiff took, starting prior to his diagnosis with HIV (the 11 days prior to May 4, 2010), the six weeks of leave he took between May and mid-June 2010, the leave he had to take unexpectedly in September 2010 through what would have been sometime in November 2010, combined with his admitted errors in job performance, meant that he was not an "individual with a disability who, with or without reasonable accommodation"

could perform the "essential functions of the employment position." 42 U.S.C. § 12111(8).

**\*8** Courts have found that requested leave was unreasonable as a matter of law when absences were so erratic that the employer literally could not know from one day to the next whether the employee would be returning to work. *See Waggoner v. Olin Corp.,* 169 F.3d 481 (7th Cir.1999). That is precisely the situation here. Plaintiff missed several days of work (not even those due to his disability, but also to his own choice of residence), six weeks between May and June 2010, and additional unexpected leave commencing on a day he said he would be at work in September 2010 which was to continue likely into mid-November 2010. Those absences and the manner in which they occurred (*e.g.,* erratically) are not disputed in the record. Such absenteeism is sufficient to find that plaintiff was unable to perform the essential functions of his job. *See, e.g., Rios v. Dep't of Educ.,* 351 Fed. Appx. 503, 505 (2d Cir.2009) (affirming the district court's grant of summary judgment for the defendant because plaintiff "was unable to demonstrate that she was 'otherwise qualified' within the meaning of the APA because she could not perform the 'essential function' of regularly showing up to work"); *Vandenbroek v. PSEG Power, CT LLC,* 365 Fed. Appx. 457, 459–60 (2d Cir.2009) (plaintiff was not able to show that he was "otherwise qualified" because "reliable attendance at shifts was an essential function" of his job). Even if Major had terminated plaintiff for his absenteeism (and as discussed below, they did not), plaintiff's future unpredictability in showing up for work is sufficient reason to conclude that plaintiff could not perform the essential functions of his job. *See Teahan v. Metro–North Commuter R.R. Co.,* 80 F.3d 50, 55 (2d Cir.1996) (affirming the district court's finding that the plaintiff was not "otherwise qualified" because his employer could have concluded that he posed a recurring risk of absenteeism). Plaintiff has failed to meet his burden in showing that he was "otherwise qualified" to meet the essential requirements of his job with Major. *See Borkowski v. Valley*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**

*Central Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995).

Absences aside, plaintiff experienced problems in actually performing the essential functions of his job period. Plaintiff does not dispute that he made errors in the performance of his duties at Major. Instead, he essentially asks the Court to overlook those errors because others at Major made the same or similar errors (although there is no support in the record, other than plaintiff's assertion, for that fact). (*Cf.* Doe Aff. ¶ 38.) In any event, that assertion does not raise a triable issue of fact as to whether plaintiff himself was able to perform the essential functions of his job.

Correctly booking models for Fashion Week, correctly conveying information to models about the time of their bookings, correctly posting information about models to Major's website presumably are all core functions of an assistant's job at a modeling agency. The undisputed facts recited above demonstrate that plaintiff committed errors in performing all of those job functions, as well as others. A number of errors occurred prior to plaintiff's diagnosis with HIV, and thus, add further support to the Court's conclusion that plaintiff was unable to perform with the reasonable accommodations made for him by Major (*i.e.,* allowing him to keep his job despite errors and lateness or absenteeism). Even so, Major provided plaintiff a number of "free passes" in which they allowed him to continue in his role despite those mistakes, including a purportedly "serious" one on September 10, 2010 related to Fashion Week. That in and of itself demonstrates that defendants provided reasonable accommodation to plaintiff.

**\*9** Second, plaintiff likewise fails on proving that he was fired *because* of his diagnosis with HIV. Plaintiff's claim is that while his position was eliminated through a circumstance that Major could not control—*i.e.,* Kanner's departure, they should nonetheless have continued to employ him and should be held liable for significant damages for failing to do so.

That type of accommodation exceeds the law's definition of "reasonable." *Cf. Fink v. New York City Dep't of Personnel,* 53 F.3d 565, 567 (2d Cir.1995) (finding that a reasonable accommodation "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation is reasonable"). The record is devoid of any indication that plaintiff was fired for any reason other than that Kanner's departure eliminated his position at Major as Kanner's assistant.

The only thing that plaintiff sets forth regarding his firing are a number of self-serving assertions that, even construed entirely in plaintiff's favor, fail to show (or even suggest) that he was fired based upon his disability. Plaintiff asserts that, during his negotiations for how he could remain financially secure and with full insurance benefits albeit with a reduced work schedule or on full leave, he began to suspect on September 20, 2010 that Kanner did not want him to work for him any longer. (*See* Doe Aff. ¶ 38.) [FN5] In addition, plaintiff proffers uncorroborated hearsay that John Sherman told him that Kanner no longer wanted plaintiff to work for him. (*Id.* ¶ 48.) Even crediting those assertions as true, nothing about them indicates that Kanner did not want plaintiff to work for him based on his diagnosis with HIV. A more plausible explanation is that after plaintiff made a "serious" mistake on September 10 after which he and Kanner had an "altercation," Kanner did not want to work with plaintiff based upon the fallout from that altercation.

> **FN5.** Plaintiff later contradicts that assertion when he states that Kanner told him on September 24, 2010 that Kanner would continue to speak to plaintiff despite Sherman's purported request to the contrary. (Doe Aff. ¶ 41.)

Plaintiff's further self-serving assertions that Sherman herself exhibited a "very emotional" or angry demeanor towards plaintiff, refused to speak to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**

him for a 40–minute period of time, or made rash statements in what had clearly become a tense situation (*see* Doe Aff. ¶¶ 37–38) are insufficient to show that he was terminated *because* of his diagnosis with HIV. As discussed below, the legitimate, non-discriminatory purpose proffered by defendants—*i.e.,* the elimination of his position upon Kanner's departure—provides a more plausible explanation for plaintiff's termination.

Accordingly, plaintiff has failed to meet his burden of demonstrating a prima facie case of discriminatory under the ADA.

ii. *Legitimate, Non–Discriminatory Reason*
Even if plaintiff could establish a prima facie case (and as discussed above, he cannot), plaintiff fails to rebut the uncontroverted evidence of defendants' legitimate, non-discriminatory reason for plaintiff's termination.

The event that resulted in the elimination of plaintiff's position occurred through no fault of Major's or Sherman's. It is undisputed that his position with Major was to function as Kanner's assistant; it is also undisputed that Kanner abruptly left Major in late October 2010, taking a significant portion of Major's male model business with him. In other words, Major no longer needed to have an assistant for Kanner, because Kanner was no longer with Major. Nothing presented by plaintiff rebuts defendants' legitimate, non-discriminatory reasons for his termination. That in itself is sufficient grounds on which to grant summary judgment.

**\*10** It may be that plaintiff would have preferred to have been placed in a new position at Major, but there is no legal requirement that as part of reasonable accommodation under the ADA, Major create a new position for him at a now smaller firm, once his own position was eliminated. *Cf. Fink,* 53 F.3d at 567. Indeed, there is undisputed evidence that as a result of

Kanner's departure Major eliminated other positions in addition to plaintiff's. (Sherman Aff. ¶ 23.)

There is no doubt that based on the chronology of events, Kanner's departure from Major followed a period of months when plaintiff and defendants had been dealing with plaintiff's absences and discussing a period of disability leave or termination that might provide plaintiff with financial resources along with a period of health coverage. But there is no evidence in the record of any causal link between those discussions and Kanner's departure from Major.

Defendants have proffered a legitimate, non-discriminatory reason for plaintiff's termination which stands unrebutted in the record. Thus, even if plaintiff could establish a *prima facie* case, he has not offered sufficient evidence to create a triable issue of fact regarding whether he terminated *because* he was diagnosed with HIV.

Accordingly, this Court grants defendants' motion for summary judgment on plaintiff's ADA discrimination claim.

B. *Retaliation Claim*
To establish a *prima facie* case of retaliation, a plaintiff must show that: (i) he engaged in a protected activity; (ii) defendant was aware of that activity; (iii) he suffered an adverse employment action; and (iv) there was a causal connection between that protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 66 (2d Cir.1998). *McDonnell Douglas* burden-shifting likewise applies to retaliation claims under the ADA. *Terry v. Ashcroft,* 335 F.3d 128, 141 (2d Cir.2003).

To compare the elements of a *prima facie* retaliation case with the undisputed facts recited above forecloses this claim before it can even begin. Plaintiff has not made any claim whatsoever—and has not asserted any facts that lead this Court to believe—that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)
**(Cite as: 2012 WL 763556 (S.D.N.Y.))**

plaintiff engaged in any protected activity. Filing this action—which occurred nearly ten months after the elimination of plaintiff's position as Kanner's assistant and nearly eight months after plaintiff stopped receiving gratis health care benefits from Major—is the most the Court could construe as a protected activity. Stating the timing of that action shows the absurdity of construing it as a protected activity in an ADA retaliation context. That aside, the record is notably devoid of *any* facts supporting any elements of a *prima facie* retaliation claim under the ADA. For that reason, the Court grants defendants summary judgment on the ADA retaliation claim as well.

### III. THE STATE AND CITY LAW CLAIMS

Plaintiff has also asserted claims under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.,* and the New York City Human Rights Law, N.Y. City Admin. Code § 8–107, against all defendants for discrimination and retaliation on the basis of disability. (*See* Compl. ¶¶ 75–97.) Because claims under those state and city statutes are subject to *McDonnell Douglas* burden shifting, and because, as discussed above, defendants have offered a legitimate, non-discriminatory basis for plaintiff's termination which plaintiff has failed to rebut, the Court finds that defendants are entitled to summary judgment on those claims as well. *See Fall v. N.Y. St. United Teachers,* 289 Fed. Appx. 419, 422 (2d Cir., 2008); *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 n. 2 (2d Cir.2006).[FN6]

> FN6. Because this Court has determined that all claims fail as a matter of law, it need not reach the other questions raised by defendants.

### CONCLUSION

**\*11** For the aforementioned reasons, the Court finds that plaintiff has failed to raise a genuine issue of material fact on his discrimination and retaliation claims under federal, state, or city law.

Accordingly, defendants' motion for summary judgment is GRANTED and this case is dismissed.

The Clerk of Court is directed to enter judgment for defendants.

The Clerk of the Court is further directed to terminate the motion (Dkt. No. 19) and to terminate this action.

SO ORDERED:

S.D.N.Y.,2012.
Doe v. Major Model Management Inc.
Not Reported in F.Supp.2d, 2012 WL 763556 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Angela LUPE, Plaintiff,
v.
Eric K. SHINSEKI, as Secretary of the Department of
Veterans Affairs, Defendant.

No. 1:10–CV–198 (MAD/ATB).
Aug. 24, 2012.

O'Connell and Aronowitz, Kurt E. Brattan, Esq., of
Counsel, Albany, NY, for Plaintiff.

Richard S. Hartunian, United States Attorney, William F. Larkin, Esq., Asst. United States Attorney, of
Counsel, Albany, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**
MAE A. D'AGOSTINO, District Judge.
**INTRODUCTION**
**\*1** Plaintiff Angela Lupe ("plaintiff") brings this
action pursuant to the Rehabilitation Act of 1973, 29
U.S.C. §§ 701–796l ("Rehabilitation Act") and 42
U.S.C. § 2000e et seq. ("Title VII") based on employment-related disability discrimination, harassment and retaliation. Presently before the Court is
defendant's motion for summary judgment and dismissal of plaintiff's complaint pursuant to Rule 56 of
the Federal Rules of Civil Procedure. (Dkt. No. 20).
Plaintiff opposes the motion. (Dkt.Nos.22–25).

**FACTS AND BACKGROUND**[FN1]

FN1. Local Rule 7.1(a)(3) states:

**Summary Judgment Motions**

Any motion for summary judgment shall
contain a Statement of Material Facts. The
Statement of Material Facts shall set forth,
in numbered paragraphs, each material fact
about which the moving party contends
there exists no genuine issue. Each fact
listed shall set forth a specific citation
to the record where the fact is established.
The record for purposes of the Statement
of Material Facts includes the pleadings,
depositions, answers to interrogatories,
admissions and affidavits. It does not,
however, include attorney's affidavits.
Failure of the moving party to submit an
accurate and complete Statement of Material Facts shall result in a denial of the
motion.

The opposing party shall file a response to
the Statement of Material Facts. The
non-movant's response shall mirror the
movant's Statement of Material Facts by
admitting and/or denying each of the movant's assertions in matching numbered
paragraphs. Each denial shall set forth a
specific citation to the record where the
factual issue arises. The non-movant's response may also set forth any additional
material facts that the non-movant contends are in dispute. *Any facts set forth in
the Statement of Material Facts shall be
deemed admitted unless specifically controverted by the opposing party.*

Local Rule 7. 1(a)(3) (emphasis in original).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

Defendant filed a Statement of Material Facts and plaintiff properly responded. Plaintiff also set forth additional material facts. Defendant did not respond to these additional assertions in the reply submission. The background set forth in this section is taken from: (1) defendant's Statements of Material Facts and plaintiff's responses therein; (2) the exhibits and evidence submitted by defendant in support of the motion for summary judgment; and (3) the exhibits and evidence submitted by plaintiff in opposition to the motion for summary judgment. To the extent that the "facts" asserted by plaintiff in the Statement of Material Facts are supported by the record, the Court will consider them in the context of the within motion. The facts recited are for the relevant time period as referenced in the complaint.

The record contains few undisputed facts. Plaintiff is a veteran of the United States Army and participated in a fourteen month deployment to Iraq in February 2003. In January 2005, plaintiff was honorably discharged from the Army. In April 2008, plaintiff became employed by the Veterans Administration ("VA") as a Veterans Integrated Service Network 2 ("VISN2") administrative support assistant. Barbara Casey ("Casey") was employed as an administrative officer within VISN2 and was plaintiff's immediate supervisor. From 2004 until 2010, Linda Weiss ("Weiss") was the VISN2 Deputy Director and was Casey's immediate supervisor. Frances Peters ("Peters") was employed as the network health benefits officer for VISN2 and the Operation Enduring Freedom/Operation Iraqi Freedom contact person. Donna Dardaris was a health systems specialist and considered Weiss a "close friend" whom she has known her for at least twenty years. Dardaris testified that she reported to Tom Sharpe, the Chief Financial Officer not to Weiss. Dardaris had no responsibilities with regard to plaintiff.

Casey and Peters described plaintiff as an "excellent" employee. The VISN2 office was located in a converted two story apartment building known as Building Number 7 on the grounds of the Veterans Administration Medical Center. Weiss' office was on the first floor in a small area that was formerly an enclosed porch and approximately 9 x 12 in dimension. When plaintiff began working in Building Number 7, her office was located on the second floor.

During the course of plaintiff's employment at VISN2, plaintiff was periodically absent to attend medical appointments to treat, *inter alia,* plaintiff's diagnosed Post Traumatic Stress Disorder ("PTSD"). Plaintiff advised some of her co-workers of her difficulties. In a treatment noted from May 21, 2008, Elizabeth P. Donovan, plaintiff's Clinical Social Worker, noted that plaintiff was the primary caregiver for her stepson who suffered from Downs Syndrome and exhibited "challenging behavior". The VA has a formal process utilized in the evaluation of formal reasonable accommodation requests. VA policy specifies that a reasonable accommodation request be acted upon within ten days of receipt of the completed package.

After plaintiff began working at VISN2, she began to ambulate with a cane. [FN2] Casey noticed that plaintiff was having difficulties walking and asked Weiss to move plaintiff's office to the first floor. Weiss asked plaintiff whether she felt confident making her way to her work area on the second floor and plaintiff stated that she was fine. Weiss later observed plaintiff going to the second floor by sitting on the stairs and lifting herself up to the next step. Plaintiff reiterated that she was fine. However, Weiss moved plaintiff's office to the first floor.

FN2. There is conflicting testimony with regard to when plaintiff began using a cane.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

**\*2** During the winter of 2008 and 2009, Casey noticed plaintiff "struggling" to walk. In or around April or May 2009, plaintiff began to use a wheelchair. Casey and Weiss observed plaintiff in the wheelchair at work. As a result of plaintiff's wheelchair use, the lip on the ramp into the building was removed. During the latter part of March 2009, plaintiff advised Weiss and Casey that she was having difficulty with mobility and no longer felt confident to drive. Plaintiff, Weiss and Casey discussed the possibility of plaintiff using the STAR bus for transportation to work.[FN3]

> FN3. STAR is an acronym for "Special Transit Available on Request". See http://www.cdta.org (last visited August 7, 2012).

In April 2009, plaintiff began using the STAR bus for transportation to work. On May 26, 2009, Casey and plaintiff had a meeting. Casey later summarized the meeting in an email sent to plaintiff at 12:56 p.m. The email provided, in pertinent part: "tour changes can only be made when requested to me for approval first and then final approval by Linda [Weiss]. If I deny the request you have the right to go directly to Linda for her approval/denial. Tour changes also must be requested ahead of time at least a week in advance, and cannot randomly be made. Also flex time is not used here". Plaintiff confirmed the earlier conversation noting, "if flex time is not going to be an option for me for a little while, then I will need to look into alternatives, however that may happen. My bus can go 10 business days out in schedule ... but it wouldn't be consistent even if Gage wasn't in the picture". Casey replied, "[w]e will still meet with Linda regarding advanced noticed tour changes for a specific time period as discussed which I guess I left out of the message below and if approved then we can proceed with that". Plaintiff concluded the email exchange with "Ok. However the chips may fall ... I left my weapons in Iraq".

On May 26, 2009 at 1:38 p.m., minutes after plaintiff's email exchange with Casey, Suzanne H. Deane, Polytrauma Case Manager, entered the following Progress Note:

> T/C from plaintiff with questions about disability, FMLA, etc. as she is having difficulty in the workplace maintaining a schedule and is having issues with childcare for her son. States she has a meeting with her managers this afternoon and is nervous about the outcome and is thinking of just "quitting". Writer explained disability—SSD, VA disability programs and that they take a long time to apply and to receive approval. Encouraged [plaintiff] to remain in her job and find alternative arrangements while keeping her employment such as using FMLA or speaking to the EEO office for additional support with reasonable accomodations [sic].

On May 28, 2009, Donovan made the following Progress Note:

> 60 minute session requested by [plaintiff] to discuss problems she is having in the workplace, related to her medical conditions and wheelchair level mobility. She needs to start PT [physical therapy], she needs wheelchair van transportation (which is not affordable or available privately in this area) and reports that her supervisors at the job site may not fully understand her needs for accommodation. Sometimes not able to go to work due to not sleeping well, and having trouble with schedule and transportation. Suzanne Dean [sic], OEFOIF case manager joined the session at the end, to provide additional support regarding the employment concerns. By the end of the session, Ms. Lupe had the needed forms to review/complete for Accommodation requests as well as Family Medical Leave usage. Initially, she stated that she did not want to ask for her employment rights, by the end of the meeting, she was willing to review the guidelines and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

work with her health providers to pursue this step by step. She has been anxious and depressed lately, she has sent several emails about how worried and frustrated she has been. Financial and family care pressures are contributing to the anxiety and frustrations, as well has [sic] her changes in health status.

**\*3** Sometime between the end of May 2009 and June 1, 2009, plaintiff provided Casey with a proposed work schedule for the entire month of June. Plaintiff told Casey, in general conversation, that it would be better for her to work from home because of her son's schedule and problems with transportation to school. Plaintiff also provided Casey with a Request for Accommodation.[FN4]

> [FN4]. The Request for Accommodation is annexed to plaintiff's affidavit in opposition to defendant's motion and was properly authenticated by plaintiff. The request is undated. During her deposition, plaintiff stated that she could not recall the exact date that she made the request "believes" it was the end of May 2009.

In plaintiff's accommodation request, plaintiff indicated that she wanted to work from home two days per week on Monday and Friday and to adjust her hours to facilitate STAR bus transportation. Plaintiff described her medical condition and how it interfered with her performance, conduct and/or attendance:

(1) I cannot bathe or fully dress myself most days. (2) I push myself to do daily tasks and what I can't my spouse does. (3) I can't walk or stand. (4) Difficulty sleeping. (5) Incontinence from Iraq. Loss of independence in many ways physically has made my PTSD worse and Army Pride hurt. I am used to being a "do-er" and I now physically can't. I can't even play with my son like I used to or drive my car.

On June 1, 2009, plaintiff emailed her social worker, Elizabeth Donovan, and advised that she gave the accommodation paperwork to Casey. Donovan replied that she spoke with Kara Merendo [FN5] and that plaintiff needed to take copies of the request to Jane Curtin [FN6] "for accommodation and person with disability" and instructed plaintiff that, "[o]nce HR gets your requests, the turn around time is 10 days or so to respond. People can't just say no. What they usually do is bring people to the table, and address the accommodation. You can request that I be there if you want".

> [FN5]. At the relevant time, Ms. Merendo was the EEO officer.

> [FN6]. At the relevant time, Ms. Curtin was employed in the Human Resources department.

On June 1, 2009, plaintiff met with Weiss and Casey for approximately forty minutes in Weiss' office.[FN7] Plaintiff was told that her request for temporary accommodation was unworkable. After meeting with plaintiff, Weiss called for an EEO representative. Weiss and Casey met with Kara Merendo for approximately thirty minutes.

> [FN7]. Weiss, Casey and plaintiff offer conflicting accounts of what transpired in Weiss' office.

On June 1, 2009, plaintiff had an urgent visit with Donovan. Donovan prepared a Progress Note that indicated:

> "Presenting problem: She had a surge of PTSD symptoms at work today, as she describes a panic attack during a supervisory meeting to discuss her pending request for FMLA and accommodation of her physical disabilities. She states she was forced into a small office, and a manager was speaking loudly and at close range. She became over-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

whelmed, tearful, panicky. She was encouraged by her supervisor to be seen by undersigned for mental health today, and also has appointments in Rehab Medicine today for physical therapy. She has significant medical problems, with pain and limits on her mobility. Also family problems have been adding to her stress level (see previous notes), which have increased her PTSD symptoms.

On June 2, 2009, Deane prepared a Progress Note:

Rec'd voicemail message yesterday from [plaintiff] ... [plaintiff] states that she has been in contact with EEO office and is working with the EEO representative. She reports that she is doing better today and is back at work.

**\*4** On June 4, 2009, Donovan prepared the following entry:

Workplace issues exacerbated PTSD symptoms yesterday. Undersigned was away at training, but spoke to [plaintiff] by phone yesterday and today. Yesterday she stated that in the process of trying to make arrangements to use Family Medical Leave Act benefits to arrange for her health care needs, she has been called in to meetings abruptly, with closed doors, with an administrator who she feels is unsympathetic; further, she overheard the manager discussing her personal situation in the lunch room with another administrator in an unrelated department. When she asked the administrator why her personal situation was being discussed in a public place, the administrator reportedly told her that she (the admin.) had the right to vent to a peer. The [plaintiff] is trying to work within the EEO and Human Resources processes for leave use and now exploring privacy violations. Assessment: workplace stressors, health stressors, complicating her PTSD at this time. She is feeling harassed, unsafe. She states she is having intense anxiety, is not

sleeping well, does not feel she can go back to work at this time because of how anxious she is feeling.

On June 2, 2009, plaintiff reported to work. On the same day, a note from Dr. Jeffrey J. Burdick, one of plaintiff's treating physicians, was faxed to plaintiff's office. The letter supported plaintiff's request to "work from home two days a week for approximately three months".[FN8]

> **FN8.** The letter is not in proper admissible form. The parties do not dispute the contents of the letter and therefore it will be considered on the within motion.

On June 3, 2009, plaintiff reported for work and overheard a conversation between Weiss and Dardaris regarding plaintiff's medical information and accommodation request.[FN9] Dardaris admitted that she had an earlier morning conversation with Weiss in the kitchen of the Network office and testified that during the conversation, the kitchen door was open and she assumed that they we were the only people in the building. Dardaris could not recall how the conversation started but testified:

> **FN9.** Plaintiff provided only a vague summary of the substance of the conversation.

I believe Linda said—I don't even remember all of it. I remember—I felt bad for Angie and I remember expressing that, because—and I don't have any clinical background, but just observing her, it at least appeared to me that she had some sort of progressively deteriorating medical condition or some condition that was really impinging on her functioning, not in her job, but her physical functioning as far as her mobility went. And I don't really know how the conversation went from there.

I know that I might have asked Linda, was there anything we could do, isn't there anything we could

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

do for Angie, like flex time or something.

And Linda said they had already let her change her hours [ ... ]

Dardaris continued:

I remember that we were talking about Angie, and I said, I feel so bad for her. I said, I don't understand why they can't figure out what's going on with her. And, as I said, I have no clinical knowledge, but Angie went, from the time she started working with us, from being very mobile. She had an office upstairs, the stairs with no problem, was driving her own car, to—by the time I recall having this conversation, she wasn't driving, she was riding the Star bus to work, she couldn't do stairs, she couldn't walk without—she went to using a cane, she was walking hanging onto walls and she had a cane, then she was in a wheel chair. So at least it appeared to me she had something very debilitating going on.

**\*5** Dardaris stated:

Q. You told me, you said that you felt bad for Angie and you had asked if there was anything you could do for her. What else was said in the conversation?

A. You know, I can't recall it perfectly. I believe—I think I specifically asked about flex-time, if there wasn't a way to flex her hours. And Linda said, we have already adjusted her hours according to the schedule she asked us for. And I think there was—there was something else about Angie wanted a further change made, but Linda indicated it had to do with childcare more than her disability.

Dardaris testified that Weiss did not say anything negative about plaintiff but admitted that Weiss may have made comments about plaintiff's medical condition. Dardaris was "surprised to some degree" that Weiss would discuss plaintiff's private issues.

Weiss admitted that she and Dardaris discussed plaintiff's request for accommodation but explained that:

A. I asked Miss Dardaris—Mrs. Dardaris if she was going to be in the office. And she said yes. And I said, good, I intend to be on travel either tomorrow or early next week. And as she was one of the senior health systems specialists, that there were a few issues that the rest of the staff may need some guidance or support on. And I said that, you know, particularly Barbara, if there's any issues that came up in terms of processing the request for reasonable accommodation for Ms. Lupe.

Weiss continued to explain that, "[this was] an issue that we were working on, wanted to keep it moving forward and that we were trying to be as supportive as possible of Ms. Lupe, she was having a difficult time".

Plaintiff reported the incident to the VA's EEO representative, Kara Merendo. Ms. Merendo advised plaintiff to discuss the matter with Weiss. The same day, plaintiff met with Weiss in Weiss' office. The parties dispute what occurred during that conversation however, plaintiff admits that she asked Weiss about resigning. After plaintiff's conversation with Weiss, plaintiff's co-worker, Yvonne Natale, observed plaintiff crying.

On June 3, 2009, at 9:20 a.m., plaintiff sent an email to Peters with attachments. Peters sent an email asking, "[w]hat is this please? ?" Plaintiff responded with a second email at 9:26 a.m. and stated:

Bombarded you with attachments. I am quitting right now. If you weren't able to get stuff I sent I am sure IS can get into my computer for it. More stuff. And even this will be read by Linda. But I guess an email I sent you that you sent to barb got to Linda.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

Etc. etc. etc. Sorry to leave you like this. With so much. We will talk soon. Safe journeys.

Plaintiff telephoned her brother to pick her up and immediately went outside. The record contains conflicting accounts of the events that transpired after June 3, 2009 and the contradictory accounts will be discussed in detail *infra.* However, the parties agree that plaintiff did not return to her employment with the V.A. after June 3, 2009.

**\*6** On July 29, 2009, plaintiff applied for Supplemental Security Income. At the time of her deposition, plaintiff was receiving monthly Social Security Disability benefits. On February 19, 2010, plaintiff filed a complaint in this Court asserting four causes of action: (1) discrimination based on disability; (2) retaliation; (3) a hostile work environment; and (4) failure to provide a reasonable accommodation. (Dkt. No. 1). Plaintiff claims that she suffered from adverse employment actions, including but not limited to termination/constructive discharge as a result of the first three causes of action.

## DISCUSSION

Defendant moves for summary judgment and dismissal of plaintiff's complaint in its entirety.

## I. STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If

the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir.1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.,* 92 F .3rd 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56(c). In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citation omitted). These determinations are within the sole province of the jury. *Id.*

## II. REHABILITATION ACT

"Section 501 of the Rehabilitation Act establishes a program within the federal government to encourage the employment of individuals with disabilities, and applies to '[e]ach department, agency, and instrumentality (including the United States Postal Service and the Postal Rate Commission) in the executive branch' ". *Rivera v. Heyman,* 157 F.3d 101, 103 (2d Cir.1998) ( 29 U.S.C. § 791(b) (1994)). Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of his or her disability ... be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

activity conducted by any Executive agency." *Id.* (citing 29 U.S.C. § 794(a)). "[S]ection 504 is enforceable through Title VI of the Civil Rights Act of 1964, which provides (*inter alia* ) for the termination of federal financial assistance to recipients who discriminate in violation of section 504." *Id.* (citing 42 U.S.C. § 2000d–1 (1994)). As a federal employee, plaintiff's claims are governed by the Rehabilitation Act.

**\*7** The plaintiff in a Rehabilitation Act suit bears the initial burden of establishing a *prima facie* case under the Act. *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994). Courts analyze claims of intentional discrimination under the Rehabilitation Act with the *McDonnell Douglas* burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48–49 (2d Cir.2002) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). "If the plaintiff makes out a *prima facie* case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their employment decision." *Reg'l Econ. Cmty. Action Program, Inc.,* 294 F.3d at 48–49. (citations omitted). If the defendants meet that burden, the plaintiff must then prove that the stated reason is mere pretext for discrimination, i.e., that the defendants intentionally discriminated against them on a prohibited ground. *Id.* If, "the plaintiff makes a substantial showing that the defendant's proffered explanation was false, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* (citations omitted).

Although the Act forbids employment discrimination based on disability, "an employer is entitled to make employment decisions based on the 'actual attributes of the handicap.' " *Mattison v. Potter,* 515 F.Supp.2d 356, 375–376 (W.D.N.Y.2007) (citing *Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 515 (2d Cir.1991)). If the employer relies upon

the employee's disability as the reason for the adverse employment action, it is the employer's burden to rebut the inference that the disability was improperly considered by demonstrating that the disability is relevant to qualifications for the position. *Heilweil,* 32 F.3d at 722. An employer relies on an employee's disability if the employer takes an adverse job action against the employee "solely be reason of" his disability. *Mattison,* 515 F.Supp.2d at 376 (citing *Teahan,* 951 F.2d at 515). "The ultimate burden remains the plaintiff's to prove he is qualified for the position despite his disability." *Id.* (citations omitted).

"A qualified individual can base a discrimination claim on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation' ". *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009) (citation omitted). In this matter, plaintiff's discrimination claim is based on two theories: failure to make reasonable accommodations and intentional discrimination.

## A. REASONABLE ACCOMMODATION

Plaintiff claims that defendant discriminated against her by failing to make a reasonable accommodation. "A plaintiff can make a *prima facie* showing of failure to make a reasonable accommodation under the Rehabilitation Act by establishing (1) that she is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of her disability, (3) that with reasonable accommodation, she could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations". *Carter v. Potter,* 2008 WL 1848639, at \*5 (E.D.N.Y.2008) (citing *Stone v. City of Mt. Vernon,* 118 F.3d 92, 96 (2d Cir.1997)).

## 1. Qualified Individual

**\*8** The ADA defines "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

(B) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2). The Second Circuit has applied the three-step approach to determining whether an individual is disabled:

> Plaintiff must first show that she suffers from a physical or mental impairment. Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a "major life activity." Third, the plaintiff must show that her impairment "substantially limits" the major life activity previously identified.

Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 147 (2d Cir.2002). The term "major life activity" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working ." Weigand v. Niagara Frontier Transp. Auth., 2010 WL 584021, at *7–8 (W.D.N.Y.2010) (29 C.F.R. § 1630.1(i)). Courts may consider the following factors in this analysis: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment. See 29 C.F.R. § 1630.2(j)(2).

The Supreme Court has held that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-both positive and negative-must be taken into account when judging whether that person is 'substantially limited' in a major life ty." Bartlett v. New York State Bd. of Law Exam'rs, 226 F.3d 69, 80 (2d Cir.2000) (citing Sutton v. United Airlines, Inc., 527 U.S. 471, 482 (1999). However, the use of corrective devices or mitigating measures "does not, by itself, relieve one's disability." Sutton, 527 U .S. at 488. "For example, individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because

of a substantial limitation on their ability to walk or run. The same may be true of individuals who take medicine to lessen the symptoms of an impairment so that they can function but nevertheless remain substantially limited." Id.

Here, plaintiff claims that she suffers from an impairment, PTSD, that substantially limits her ability to walk. Plaintiff's impairment is well documented and defendant does not dispute that plaintiff suffers from PTSD. See Felix v. New York City Transit Auth., 154 F.Supp.2d 640, 653–654 (S.D.N.Y.2001) (the plaintiff suffered from PTSD for approximately four years and while the condition was not permanent, it was of sufficient duration to qualify as an ADA impairment). Factfinders do not need expert testimony to understand that a person confined to a wheelchair is substantially limited in the major life activity of walking. E.E. O.C. v. Yellow Freight Sys., Inc., 2002 WL 31011859, at *15 (S.D.N .Y.2002) (citation omitted); Gillen v. Fallon Ambulance Serv., Inc ., 283 F.3d 11, 22 (1st Cir.2002) (citing Sutton, 527 U.S. at 488) (explaining that "individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run")). As a matter of law, the Court finds that plaintiff is disabled within the meaning of the Act.

**2. Notice of Disability**

**\*9** Plaintiff has no duty to provide medical documentation supporting her disability when the disability is obvious. Bohen v. Potter, 2009 WL 791356, at *15 (W.D.N.Y.2009) (the plaintiff wore a surgical boot to work everyday and his ability to walk was described as "slow and with a noticeable gait"). Here, defendant does not dispute that plaintiff was diagnosed with PTSD but argues there is no evidence that plaintiff's colleagues were aware of her condition, "other than the physical deterioration which they observed on a daily basis".

Upon review of the record, the Court finds more

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

than sufficient evidence that plaintiff's co-workers and supervisors were aware of plaintiff's disability. The witnesses testified that they noticed plaintiff experiencing mobility difficulties and observed her ambulate with a cane and ultimately, a wheelchair. Weiss moved plaintiff's office to the first floor from the second floor after she observed plaintiff experiencing difficulties negotiating the stairs. Weiss and Casey knew that plaintiff used the STAR bus for transportation to work due to her lack of confidence in her driving ability and Casey admitted that a lip on the ramp into the building was removed after plaintiff began using a wheelchair.

Based upon the record, a reasonable jury could find that plaintiff displayed an obvious disability and therefore, defendant had knowledge of her condition.

### 3. Perform Essential Functions With Reasonable Accommodation

A qualified individual with a disability must be able to perform the essential functions of that position. *Felix,* 154 F.Supp.2d at 656. The Second Circuit has held:

> The plaintiff bears the burden of production and persuasion on the issue of whether she is otherwise qualified for the job in question. A plaintiff cannot be considered otherwise qualified unless she is able, with or without assistance, to perform the essential functions of the job in question. It follows that the plaintiff bears the burden of proving either that she can meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions.

*Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 137–8 (2d Cir.1995).

Whether the employee is "otherwise qualified" as of the date of an adverse action is forward-looking and enables the employer to consider how the employee

will perform as compared to non-disabled individuals. *Teahan,* 951 F.2d at 521. "[T]he 'otherwise qualified' inquiry asks whether the plaintiff will be able to do the job." *Messer v. Bd. of Educ. of City of New York,* 2007 WL 136027, at *11 (E.D.N.Y.2007) (citing *Shannon v. New York City Transit Auth.,* 332 F.3d 95, 100 (2d Cir.2003)).

Defendant contends that plaintiff made admissions to the Social Security Administration ("SSA") regarding her ability to perform her job. To wit, defendant claims that plaintiff advised SSA that she was disabled and unable to perform her essential job functions as of June 3, 2009. Defendant also claims that plaintiff's "attendance issues" rendered her unable to perform the essential functions of her job.

### a. Social Security Benefits

*10 Under the Social Security Act, a claimant is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 992 F.Supp. 395, 405–406 (S.D.N.Y.1998) (citing 42 U.S.C. § 423(d)(1) (A)). "Unlike the ADA, the Social Security Act does not address the effect of reasonable accommodation on the individual's claim." *Id.* "[T]he Supreme Court has held that the pursuit and receipt of Social Security disability benefits, without more, neither estops the recipient from pursuing an ADA claim nor creates any special presumption against the recipient showing, for purposes of an ADA action, that with reasonable accommodation he or she could perform the essential functions of the job." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6–7 (2d Cir.1999) (citing *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795 (1999)); *see also Bohen,* 2009 WL 791356, at *9 (citation omitted) (the receipt of Worker's Compensation Benefits and Social Security Disability Benefits "does not automatically bar a claim [ ... ]"). However,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

"[a] plaintiff who is receiving disability benefits must proffer a 'sufficient explanation' for why she asserted total disability in the agency proceeding while maintaining that she was a 'qualified individual with a disability' in the ADA action." *Bohen,* 2009 WL 791356, at *9. "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror to conclude that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Id.* (citing *Nodelman v. Gruner & Jahr USA Pub.,* 2000 WL 502858, at *8 (S.D.N .Y.2000) (internal citations omitted)).

In this matter, plaintiff does not dispute that she received social security benefits but claims that while the SSA determined that she was "disabled as of June 1, 2009", she never made any statement to the SSA regarding her ability to perform her job at VISN2. Plaintiff claims that the document, upon which defendant relies, was prepared by the SSA and that it is not her own sworn statement. The Court has reviewed the document and the other documents relating to plaintiff's social security benefits and finds that the record does not contain any sworn statement from plaintiff, document executed by plaintiff or any administrative hearing transcripts. There is no evidence establishing that plaintiff claimed or represented to SSA that she was totally disabled as of June 1, 2009 and unable to perform her job at VISN2 without reasonable accommodations. *See Marvello v. Chemical Bank,* 923 F .Supp. 487, 491 (S.D.N.Y.1996) (the Court has no evidence as to what statement the plaintiff might have made to the Social Security Administration about his condition). Without any such admissions, the Court cannot conclude as a matter of law that plaintiff was unable to perform the essential functions of her job at VISN2 solely because she pursed social security benefits. *See Fussell v. Georgia Ports Auth.,* 906 F.Supp. 1561, 1575–76 (S.D.Ga.1995) (while "there is every reasonable inference" that plaintiff swore to being totally disabled

"given the working framework of the SSI program," since there was no direct evidence in the record that plaintiff swore to disability, summary judgment denied); *see also Mohamed v. Marriott Int'l, Inc.,* 944 F.Supp. 277, 283 (S.D.N.Y.1996) ( "[i]n light of th[e] differing legal standards, [the plaintiff's] assertion of inability to work for SSDI purposes is not necessarily inconsistent with his claim of being capable of performing the essential functions of the job from which he was discharged"); *cf. DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 105 (2d Cir.2010) (the record is clear that the plaintiff had physical limitations, and that he felt he needed to work from home and therefore, "it is hardly surprising that he said on the disability application forms that he was disabled or unable to grab, reach, or commute").

**b. Attendance Issues**

**\*11** An individual who is incapable of regular attendance or unable to come to work is not otherwise qualified. *Bohen,* 2009 WL 791356, at *9; *see also Bobrowsky v. New York City Bd. of Educ.,* 1999 WL 737919, at *4 (E.D.N.Y.1999), *aff'd mem.,* 213 F.3d 625 (2d Cir.2000) ("[t]here could be no reasonable accommodation because attendance is an essential function of her employment"). Summary judgment is warranted when the defendants provide enough evidence "to permit [the Court] to rule, as a matter of law, that allowing [the plaintiff] to work a fully flexible schedule would prevent him from performing the essential functions of his job". *Varone v. City of New York,* 2003 WL 21787475, at *15 (S.D.N.Y.2003).

Here, the parties do not dispute that plaintiff had "attendance issues." However, the Court cannot conclude, as a matter of law, that these attendance issues rendered plaintiff unable to perform the essential functions of her job. Plaintiff's supervisors were aware of the issues regarding plaintiff arriving on time to work with the STAR bus. Weiss testified that if plaintiff boarded the bus at 9:00 a.m., it could take several hours for her to arrive at work. Despite this problem, Weiss testified that they were "working with

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

plaintiff's schedule". Weiss also testified that due to "extraordinary" personal issues in plaintiff's life, she intended to work with plaintiff in two week blocks to accommodate her schedule.

Further, the record in this case is far from clear about the essential functions of plaintiff's position. Weiss testified that formal administrative hours were 8:00 a.m. to 4:30 p.m. but that "multiple staff" worked 7:00 a.m. to 3:30 p.m. or 9:00 a.m. to 5:30 p.m. Weiss provided testimony with regard to plaintiff's position when presented with a copy of the VA's "Position Description"; however the record contains conflicting testimony with respect to how much, if any, of plaintiff's job required her to be present in the workplace. For example, Weiss testified that phone and reception coverage were part of plaintiff's duties however, when asked how many times plaintiff was previously asked to provide phone coverage, Weiss testified, "I don't know".

The Court finds that defendant has not provided competent, admissible evidence to support the contention that plaintiff's attendance issues rendered her unable to perform her essential functions or whether plaintiff's physical presence at the VISN2 offices was required. *See King v. Town of Wallkill,* 302 F.Supp.2d 279, 290 (S.D.N.Y.2004). Accordingly, the Court finds that the issue of whether plaintiff was "otherwise qualified" to perform her job must be determined by the jury.

**4. Failure to Provide Reasonable Accommodations**

Plaintiff argues that defendant failed to accommodate plaintiff by refusing to alter her work schedule. Plaintiff claims that defendant failed to engage in the interactive process and denied her request, threatened her and terminated her. Plaintiff "adamantly denies" that she resigned. Defendant argues that plaintiff submitted an incomplete request for accommodation on June 1, 2009 and then, two days letter, resigned before defendant could review and respond to plaintiff's request for accommodation.

Defendant argues that based upon plaintiff's emails to Peters, Casey's testimony and plaintiff's co-workers' testimony, there is no question that plaintiff resigned.

**a. Law**

**\*12** "Reasonable is a rational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce." *Borkowski,* 63 F.3d at 138. The analysis requires an inquiry not only into the benefits of the accommodation but into its costs as well. *Id.* (an accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce). "The plaintiff has the burden of establishing that an accommodation be reasonable, i.e., the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* (the burden on plaintiff is not "a heavy one"). Once the plaintiff has made out a *prima facie* showing that a reasonable accommodation is available, the employer can defeat the claim if it shows (a) that making a reasonable accommodation would cause it hardship, and (b) that the hardship would be undue. *Nakis v. Potter,* 2004 WL 2903718, at *14 (S.D.N.Y.2004). The burden of proof on these two issues is on the employer. *Id.* (citing *Stone,* 118 F.3d at 96). The Second Circuit has held that a "reasonable accommodation" may include such adjustments as modification of physical facilities, work schedules, or equipment, or some job restructuring. *Carter,* 2008 WL 1848639, at *5 (citing *Gilbert v. Frank,* 949 F.2d 637, 642 (2d Cir.1991) (citation omitted)). However, it does not incorporate "elimination of any of the job's essential functions." *Id.* An essential function "encompasses more than core job requirements; indeed, it may also include scheduling flexibility". *Reville v. Niagara Frontier Transp. Auth.,* 2009 WL 5167645, at *8 (W.D.N.Y.2009) (citation omitted). With respect to requests for schedule or shift changes, if the plaintiff seeks to, "mak[e] defendant create a new job for [her] .... Such accommodation is not reasonable since it would permit plaintiff to work shifts different from those of all other [similarly situated employees]. This

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

not only eliminates an essential function of [plaintiff's] position but it also creates an entirely new position and imposes an additional burden on [plaintiff's] co-workers." *Bogner v. Wackenhut Corp.,* 2008 WL 84590 at *6 (W.D.N.Y.2008); *see also Melrose v. New York State Dep't of Health Office of Prof'l Med. Conduct,* 2011 WL 1431981, at *8 (S.D.N.Y.2011) (granting a schedule change would have contributed to the plaintiff's unreliability, low productivity and attendance problems).

Federal regulations provide for "an informal interactive process" between the employer and employee to identify a reasonable accommodation for the employee. 20 C.F.R. § 1630.2(o)(3). Although the covered entity is required to initiate an interactive process, the ADA also requires that the employee participate and specify fully the necessary accommodations and options. *Witchard v. Montefiore Med. Ctr.,* 2009 WL 602884, at *16–17 (S.D.N.Y.2009) (after receiving the request for accommodation, the employer scheduled conferences, communicated with the plaintiff's doctors and identified a new position for the plaintiff. The employee's cooperation and continued engagement is of paramount importance. *Id.* (citing *Beck v. Univ. of Wisc. Bd. of Regents,* 75 F.3d 1130, 1137 (7th Cir.1996)). "[I]t is clear that the employee and the employer are required to participate, in good faith, in the 'interactive process' of arranging a reasonable accommodation, and that a plaintiff who causes the breakdown of the interactive process may not recover. *Nugent v. St. Lukes–Roosevelt Hosp. Ctr.,* 2008 WL 5341379 at *2 (2d Cir.2008) (citing 29 C.F.R. § 1630.2(o) (3)); *Winbush–Jones v. Potter,* 2009 WL 497637, at *11 (W.D.N.Y.2009) (the plaintiff left work emotionally distraught without subsequently contacting her employer or making any further request for accommodation) (citing *Loulseged v. Akzo Nobel, Inc.,* 178 F.3d 731, 740 (5th Cir.1999) (district court properly granted judgment as a matter of law to defendant-employer, where plaintiff quit rather than giving employer an opportunity to continue with the interactive process). When there is a genuine issue

of fact as to who is responsible for obstructing the process, summary judgment is improper. *Bohen,* 2009 WL 791356, at *14.

**b. Relevant Deposition Testimony**

**\*13** The witnesses provide conflicting and somewhat contradictory testimony with regard to the events that transpired at the VISN2 offices on June 3, 2009.

Plaintiff testified that on June 3, 2009, she arrived at the office between 6:30 am and 8:00 a.m. and overheard a conversation between Weiss and Dardaris. Plaintiff testified that Weiss was providing Dardaris with details concerning plaintiff's personal medical issues and her accommodation request. Upon overhearing the conversation, plaintiff testified that she called the "EEO person", Kara Merendo who advised plaintiff to speak with Weiss. Plaintiff testified that when she confronted Weiss. Plaintiff testified about the discussion during the meeting:

> A. In talking about how I was feeling at that moment, and she had said that the accommodation request would be denied and this would be denied and everything, we had talked—well, I had said that I didn't know if in good conscience I could still work there. And I had left the office. I mentioned to her what is involved in resigning. I asked her questions about that. Her answer was she was going to have Barb get paperwork for me to look at. I went back to my desk.

Weiss testified that during the June 3, 2009 meeting in her office, plaintiff asked Weiss to fire her and when Weiss refused, plaintiff said she "will resign immediately because morally and ethically I do not feel I can—that this place—I can't work here any longer and support this organization in its work for veterans". Weiss testified that plaintiff asked what she needed to do to resign and Weiss informed her that she needed to see Casey so that a "Form 52" could be

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

generated:

Q. And that she would need to sign it, Miss Lupe would need to sign it?

A. No. Ms. Lupe never needed to sign it.

Q. Did you tell Ms. Lupe that you would speak to Miss Casey and have her generate the 52? Or did you simply direct Miss Lupe to go speak to Miss Casey?

A. I said to Ms. Lupe, you need to see Barbara. Ms. Lupe left my office. I walked over to see Ms. Casey, and Ms. Casey said, Angela told me she is resigning immediately and I need to generate a, you know, generate a 52. And I said, that's exactly what she told me, she was resigning effective immediately.

During Casey's deposition, she was presented with a copy of a document entitled "Request for Personnel Action".[FN10] Casey testified:

> FN10. The document is part of Exhibit "G" annexed to defendant's motion.

A. ... I remember Angela coming in and asking me to fill it out.

Q. What did she say?

A. I was in my office and she came in and said, Linda said to do a 52 for me. And I said why. She said, I'm resigning. And I said, well, don't—let's talk. She said, just do it, I'm packing my things, I'm leaving. So I got the form ready.

Casey testified that she completed portions of the form but that plaintiff and employees from Human Resources were responsible for completing the remainder of the form. Casey testified that plaintiff's

signature was not required but that, "they prefer to have a statement". Casey stated that plaintiff would not speak with her and the last time she saw the form was when she handed it to plaintiff.

**\*14** Plaintiff testified that Casey provided her with only the last page of the form and, at the time of the deposition, plaintiff had the form, unsigned, at home. Plaintiff testified:

> A. I set it aside. It's like that's not information that's not information that's the last page of something, and I'm not signing anything because I'm not resigning. I knew at that point that I needed to see my therapist, and I was just so overwhelmed with what was going on that I knew that my therapist could, at least FMLA-wise get that through for me to take at least a few days off given what was going on. So I took some of my work that I was working on that needed like immediate stuff and gave it to a couple of people for Fran."

> Pltf. Dep. at p. 38.

Plaintiff testified that she emailed Peters because Peters was out of the office on June 3, 2009. Plaintiff conceded, "I know there was one email in particular where I had mentioned resigning". Pltf. Dep. at p. 39. The emails are part of the record herein.

Plaintiff testified that she called her brother to pick her up and while she was waiting for him, she put paperwork together for Peters and "packed up a little bit of my personal stuff that I knew I would need immediately". Plaintiff decided to see her therapist and claims that she prepared "a handwritten note requesting leave without pay for the day at the advice of somebody in the office, and I gave that to Linda before I left". Plaintiff testified that she presented the note which was dated and signed for leave without pay so she could, "go see my therapist and figure things out and stuff". Plaintiff claims that Weiss ultimately said,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

"okay, fine, go".

Weiss admits that plaintiff gave her a note but claims that the note only addressed leave to cover plaintiff's time between the time she left that day and the end of her scheduled hours. Weiss claims that she did not make a copy of the note but that she gave the note to Casey as part of the documentation. However, Casey testified that she does not recall receiving a note from Weiss.

The record also contains conflicting testimony with respect to the events that transpired on June 4th and June 5th. Plaintiff testified that she filed an FMLA request:

A. So on the 4th when I was at the V.A. with my therapist, she and I walked the paperwork to HR. And I think I talked to HR on the 4th, because I remember saying that I would be in there that day, do you want me to drop it off.

Q. What was the purpose of your FMLA paperwork?

A. Exacerbation of my PTSD because of the situation, that i needed treatment and I was also undergoing different treatment for like—they wanted to start physical therapy and stuff for my legs to see if that would help, but the main thing was because of what had just happened and my PTSD, they felt it exacerbated it.

Q. And did you learn whether that paperwork was approved?

A. I found out later that it wasn't approved or denied, because I was terminated. So it was never approved or denied. It was dismissed.

**\*15** Pltf. Dep. at 46.

Plaintiff testified that she spoke with Terry Brew in Human Resources on June 5th and that Brew indicated that Human Resources received a "52 for resignation". Plaintiff testified:

A. ... And I had told her that I didn't resign, I didn't sign anything, I didn't out process. It was my understanding that I was going to be doing this FMLA leave for the 30 days that the doctor said, and which is why I dropped off that paperwork the day before, which was the 4th. She was confused herself, didn't know what to say or make of it. Because she had said that the 52 form was send over, I think, on Wednesday. So my question was why was she telling me or her, Janet Curtin, whoever I talked to on the 4th, why were they telling me I needed FMLA paperwork if they're saying I didn't work there anymore. So she was all confused. And she had told me that the FMLA was done because they had sent off—sent over that paperwork, which we just kept going back and forth because I didn't understand why that was send over when I had not resigned. And she didn't understand what was going on either.

Plaintiff testified that her last contact with Human Resources was a week later when they asked for her employee credit card and passes.

Weiss testified that Janet Curtin, an H.R. specialist, called her on June 5th to discuss plaintiff's FMLA request. Weiss told Janet that plaintiff was no longer an employee. Weiss testified that plaintiff never expressed any interest in nor did she have any discussions with anyone in the supervisory chain with regard to FMLA.

**c. Analysis**

In support of summary judgment, defendant presents vague and conclusory arguments. Despite the lack of a cohesive argument, the Court has reviewed

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

the entire record. Based upon the testimony and documentary evidence, there are clear, material issues of fact with respect to how and when plaintiff's employment with defendant ended. There is evidence suggesting that plaintiff discussed resigning and indeed, plaintiff may have indicated to her supervisors and coworkers that she intended to resign. However, the record does not contain clear, uncontroverted evidence of such intent. To wit, the Request for Personnel Action indicates that the nature of the action is "resignation" however, the section of the form labeled Part E–Employee Resignation/Retirement is blank. Moreover, plaintiff's signature does not appear anywhere on the form. While Casey and Weiss both averred that plaintiff signature was not required on the form, that testimony is seemingly belied by the document itself and clearly an issue for a jury to resolve. The record contains vague testimony with regard to the form including what portion Casey completed and what information was supplied by Human Resources. Weiss concedes that plaintiff never signed a letter of resignation. The only admissible, competent evidence that plaintiff intended to resign is her email to Ms. Peters. Plaintiff admitted sending the email however, she testified that she subsequently decided that she needed to speak with her "advocate" regarding the events that transpired that day. Therefore, she refused to sign the "Form 52" and opted to take it home instead. There are also conflicting accounts of the substance of a handwritten note plaintiff provided to Weiss before her departure. A reasonable juror could conclude that had plaintiff intended to resign, she would not have provided Weiss with a note requesting leave without pay. Plaintiff's co-worker, Yvonne Natale, testified that she spoke with plaintiff immediately before she left the building on June 3, 2009 and plaintiff stated that she was too upset to stay that day. Natale testified that plaintiff did not tell her that she was resigning.

**\*16** Plaintiff admits that she forwarded an email to Peters and that she "mentioned" resigning. However, based upon plaintiff's deposition testimony and the events that occurred after the email exchange, the Court cannot conclude, as a matter of law, that plaintiff resigned her position. Plaintiff took no "affirmative steps" to effectuate her resignation. *Cf. Hammon v. DHL Airways, Inc.,* 980 F.Supp. 919, 924 (S.D.Ohio 1997) (the record lacked a letter of resignation but plaintiff constructively resigned his position when he failed to respond to defendant's requests). Indeed, on June 4, 2009 and June 5, 2009, two days after plaintiff allegedly resigned, she provided additional medical documentation to support her accommodation request and contacted Human Resources regarding her both this request and her request for FMLA leave. In December 2009, Janet Curtin and Terri Brew testified before EEO Investigator, Isabel Simmons.[FN11] Curtin testified that she "understood that Ms. Lupe had resigned on June 3, 2009" but admitted that she could not recall who informed her of plaintiff's resignation. Brew testified that plaintiff called several times (she could not recall dates) regarding the procedures for FMLA leave. Brew also testified that plaintiff called her on June 3, 2009 stating that she was resigning and would "clear" the next day. However, Brew later testified that she received a call from plaintiff on June 5, 2009:

> [FN11]. The transcripts are part of defendant's Exhibit "G".

Q. Okay. When she called on June 5, what was it that she was wanting to know?

A. Janet Curtin was not in the office, so the documentation was left for me in my office. And she wanted to make sure that I had received it.

Q. Okay.

A. And when I did let her know, I confirmed that I had received it, I also advised her by the way I also received the 52 for your resignation, and at that point she advised me that she had not resigned, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

then sent an e-mail to that effect following up on the conversation.

Q. Okay. So you sent her an e-mail?

A. No, she sent me one saying she did not resign in the email.[FN12]

> **FN12.** The email is not part of the record herein.

Ms. Brew testified that she spoke with "someone in Central Office" who told her that the "52" was an appropriate resignation but she could not recall who she spoke with.

Moreover, progress notes from plaintiff's social worker and case manager reveal that plaintiff discussed FMLA in May 2009 and obtained the forms from Donovan. While the record does not contain any affidavit or admissible testimony from Deane or Donovan, defendant included their Progress Notes as part of the Statement of Material Facts and therefore, does not dispute the authenticity of the records.

Defendant's motion includes an exhibit entitled "Department of Veterans Affairs Office of Resolution Management Investigative File" (Def. Exhibit "G"). Defendant makes no reference to this exhibit in the motion papers and the voluminous exhibit is not in proper admissible form. However, the exhibit contains signed statements from Weiss and Casey. While these statements have not been authenticated through sworn testimony or affidavit by either witness, even assuming they are admissible, the statements only create additional questions of fact with regard to whether plaintiff carried through with her intent to resign. Specifically, Casey's statement provides:"[s]he left without signing the 52–she took the second part with her stating she need [sic] her advocate to assist her with the form and she would be back tomorrow 6/4 to clear". Similarly, Weiss stated, "Ms. Lupe stated she

would return on June 4 to provide the employee statement on the 52 as to the reason for her resignation and she would also clear station on June 4".[FN13]

> **FN13.** Exhibit "G" also contains a statement from Mitzi Merlino, plaintiff's co-worker, however the statement is not in proper admissible form and cannot be considered in the context of the within motion.

**\*17** A reasonable juror could conclude that plaintiff would not have pursued her reasonable accommodation request or FMLA leave one day after resigning if she, in fact, resigned or intended to resign. On a motion for summary judgment, the court should not weigh evidence or assess the credibility of witnesses. *Nelson v. Metro–North Commuter R.R.,* 235 F.3d 101, 104 (2d Cir.2000). These determinations are within the sole province of the jury. *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citation omitted). Here, the Court cannot resolve the factual discrepancies without weighing the credibility of the witnesses or determining the amount of weight accorded to each account of the incident. Viewing the evidence in a light most favorable to the nonmovant, as the Court must do on a motion for summary judgment, the Court finds that there is a genuine issues of fact about how plaintiff's employment with defendant came to a conclusion. *See Jackson v. Longistics Transp., Inc,.* 2012 WL 1252543, at \*11 (W.D.Tenn.2012). Accordingly, the Court cannot conclude, as a matter of law, which party was responsible for terminating the interactive process. Thus, defendant's motion for summary judgment and dismissal of plaintiff's failure to accommodate cause of action is denied.

## B. INTENTIONAL DISCRIMINATION

Plaintiff claims that she was discriminated against because defendant treated her differently based on her disabilities. A plaintiff makes out a *prima facie* case of discrimination under the Act by showing: (1) she is a disabled person under the Act; (2) she is otherwise

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

qualified to perform her job; (3) an adverse action was taken against her because of her disability; and (4) the employer is a recipient of Federal financial assistance. *Heilweil,* 32 F.3d at 722 (citations omitted). As discussed in Part IIA(1), plaintiff is a disabled person within the meaning of the Act and the issue of whether she was otherwise qualified to perform her job is for the jury to resolve. Even assuming plaintiff was qualified to perform her job, defendant claims that plaintiff did not suffer an adverse employment action.

**1. Adverse Employment Action**

An adverse employment action under the Rehabilitation Act, just as under other employment discrimination statutes, is a " 'materially adverse change in the terms and conditions of employment". *Carter v. Potter,* 2008 WL 1848639, at *3 (E.D.N.Y.2008) (citing, *inter alia, Leget v. Henderson,* 2001 WL 43615, at *5 (S.D.N.Y.2001) (treating the definition of an adverse employment action under Rehabilitation Act identically to the definition of an adverse employment action under Title VII)). Such an action must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices. *Patrolmen's Benevolent Ass'n. of City of New York v. City,* 310 F.3d 43, 51 (2d Cir.2002) (citation omitted). An adverse action may or may not entail economic loss but there must be a link between the discrimination and some "tangible job benefits" such as "compensation, terms, conditions or privileges" of employment. *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002) (internal citation omitted). Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation. *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006). "While adverse employment actions

extend beyond readily quantifiable losses, "not everything that makes an employee unhappy is an actionable adverse action." *Phillips v. Bowen,* 278 F.3d 103, 117 (2d Cir.2002). "While there is no bright-line rule as to what constitutes an adverse employment action, the Second Circuit emphasizes that 'not every unpleasant matter short of [termination or demotion] creates a cause of action.' " *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997).

**\*18** Here, plaintiff alleges that she suffered from several adverse employment actions including: (1) being threatened and demeaned, (2) being falsely imprisoned which caused her to black out, (3) a breach of plaintiff's confidentiality by disclosing her personal information and (4) termination. Plaintiff further alleges that these events were "remarkably close in time to plaintiff's submission of her accommodation request".

**a. Threatened or Demeaned/Falsely Imprisoned/Breach of Confidentiality**

Applying the appropriate standard, the Court finds that plaintiff cannot establish a *prima facie* case based upon being threatened or demeaned, being falsely imprisoned or disclosure of personal information to a co-worker. None of the aforementioned actions resulted in material changes in the terms or conditions of her employment. The alleged actions did not adversely affect her pay or benefits nor did they result in negative evaluations or formal reprimands. *See Koniczny v. New York State Div. of Parole,* 647 F.Supp.2d 256, 262 (W.D.N.Y.2009); *see also Treglia v. Town of Manlius,* 313 F.3d 713, 720 (2d Cir.2002). Plaintiff has not alleged that she was subject to any discipline, demotion, or other punishment as a result of these incidents. Plaintiff also failed to offer any admissible evidence to support her assertion that she was falsely imprisoned. *See Fahmy v. Duane Reade, Inc.,* 2006 WL 1582084, at *10 (S.D.N.Y.2006) (the plaintiff could not sustain a cause of action for discrimination claiming that he was framed for stealing without competent admissible evidence). According-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

ly, to the extent that plaintiff's intentional discrimination claim is based upon these three instances, defendant's motion is granted.

**b. Termination**

The Court reaches a different result with respect to plaintiff's claim that she was subjected to an adverse action when she was terminated. Termination of employment is an adverse employment action sufficient to support a *prima facie* case of disability discrimination under the ADA. *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006) (asserting that there is not "any question that termination is an adverse employment action").

Assuming plaintiff suffered from an adverse action, plaintiff must then establish that the adverse employment action occurred under circumstances that would support an inference of discrimination. *Nakis v. Potter,* 422 F.Supp.2d 398, 421 (S.D.N.Y.2006). The nexus need not be direct and there is no requirement that discriminatory animus be the sole cause of any adverse action. *Id.* The Second Circuit has noted that "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision," *see Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir.1996). The time or sequence of events leading to plaintiff's termination give rise to an inference of discrimination. *Id.* "Depending on the specific facts of the case, temporal proximity can contribute to an inference of discrimination." *Trujillo v. PacifiCorp.,* 524 F.3d 1149, 1157 (10th Cir.2008) (citing *Butler v. City of Prairie Vill., Kan.,* 172 F.3d 736,749 (10th Cir.1999) (temporal proximity between ADA plaintiff's request for accommodation and decline in his work evaluations and satisfaction with his work performance contributed to discriminatory inference)). The closer in time a protected action is followed by an adverse action, the more likely temporal proximity will support an inference of discrimination. *Id.* (citing *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999)). Where the

temporal proximity is close, it is a circumstance that should be given considerable weight. *Id.*

**\*19** Here, as the Court thoroughly discussed previously, there is an issue of fact with respect to whether plaintiff resigned or was terminated. However, assuming plaintiff was terminated, based upon the sequence of events, plaintiff has met her *de minimis* burden of establishing the inference of discrimination as a motive for her alleged termination. The alleged termination occurred within three days of plaintiff submitting an accommodation request. Accordingly, a resolution of the conduct and circumstances surrounding plaintiff's dismissal are properly left to the trier of fact. *See Chambers v. TRM Copy Ctr. Corp.* 43 F.3d 29, 40 (2d Cir.1994).

**2. Legitimate, Non–Discriminatory Reasons and Pretext**

Pursuant to the *McDonnell Douglas* process, the burden shifts to defendant to articulate a non-discriminatory reason for the employment decisions. If defendant meets that burden, plaintiff must establish that defendant's proffered explanation is merely pretext for illegal discrimination. Here, defendant explains that decisions were made based upon plaintiff's resignation not termination. As previously discussed, the resolution of whether plaintiff resigned or was terminated is for the factfinder as it involves questions of credibility. Therefore, defendant's motion for summary judgment and dismissal of plaintiff's intentional discrimination claim based upon plaintiff's alleged termination is denied.

**C. RETALIATION**

Retaliation against individuals asserting rights under the Rehabilitation Act is prohibited. *Adams v. New York State Thruway Auth.,* 2001 WL 874785, at \*13 (N.D.N.Y.2001) (citing *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 827 (1st Cir.1991)). In order to establish a *prima facie* case of retaliation under the Rehabilitation Act, a plaintiff must show: (1) that she engaged in protected activity, (2) that the defendant

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

was aware of this activity, (3) that the defendant took adverse action against the plaintiff, and (4) that there is a causal connection between the protected activity and the adverse action. *Reg'l Econ. Cmty. Action Program,* 294 F.3d at 54. "A causal connection may be established either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment [ ... ].' " *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (citation omitted). The Second Circuit has held that "a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia,* 313 F.3d at 720. Plaintiffs who resort solely to temporal proximity in proving causation must demonstrate the existence of a time frame that is "very close". *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001). There is no "bright line" to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship. *Id.*

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See Treglia,* 313 F.3d at 721. If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. *See id.* Protected activity includes not only the filing of formal charges of discrimination, but also the informal protests of an employer's discriminatory practice, such as, "making complaints to management," and the request for a reasonable accommodation. *Adams* at *13 (citing *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d. Cir.1990)).

**\*20** Here, plaintiff claims that she engaged in two separate forms of protected activity: (1) she filed a reasonable accommodation request in May 2009; and (2) she complained about Weiss' behavior on June 3, 2009 to the VA's EEO officer. Defendant does not dispute that plaintiff engaged in protected activity nor does defendant claim that they were unaware of plaintiff's protected activities. Rather, defendant asserts that plaintiff did not suffer an adverse employment action because she resigned. If plaintiff was terminated, that termination constitutes an adverse employment action sufficient to satisfy this prong of plaintiff's *prima facie* case. *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) *abrogated by Lore v. City of Syracuse,* 670 F.3d 127 (2d Cir.2012).

As discussed in Part IIA, the issue of how plaintiff's employment ended is for a jury to resolve. However, assuming plaintiff was terminated, temporal proximity and circumstantial evidence support plaintiff's retaliation claim. The record establishes that plaintiff's employment ended three days after she presented her request for accommodation during a June 1, 2009 meeting with Weiss and Casey and the same day that she reported Weiss' behavior to the EEO representative. The gap between plaintiff's protected activity and her termination is close enough in time to support an inference that defendant terminated plaintiff in retaliation for asking for a making a request for reasonable accommodation. *See Constance v. Pepsi Bottling Co. of NY,* 2007 WL 2460688, at *35 (E.D.N.Y.2007). Viewing the evidence in a light most favorable to plaintiff, the Court finds that plaintiff has established a *prima facie* case of retaliation.

As discussed in Parts IIA and IIB, even assuming defendant established a legitimate, non-retaliatory reason for defendant's employment decisions, i.e., plaintiff resigned, plaintiff has offered evidence of pretext and retaliatory motives for the alleged termination. The record presents genuine issues of fact with respect to the issue of retaliation as a reasonable jury could find that defendant's decisions were motivated, at least in part, by retaliatory animus. *See Williams v. City of New York,* 2006 WL 2668211, at *22 (E.D.N.Y.2006). Therefore, defendant's motion for summary judgment and dismissal of plaintiff's claim of retaliation is denied.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

## D. HOSTILE WORK ENVIRONMENT

Plaintiff alleges that she was subjected to a hostile work environment based upon Weiss' behavior on June 1, 2009 and June 3, 2009. Specifically, plaintiff claims that Weiss: (1) demeaned and physically threatened plaintiff causing an exacerbation of plaintiff's PTSD; and (2) humiliated plaintiff causing her to suffer extreme emotional distress.

Although § 504 does not specifically address harassment claims, the few courts considering this issue have held that hostile work environment harassment is actionable under the Rehabilitation Act. *Pell v. Tr. of Columbia Univ. in City of New York,* 1998 WL 19989, at *17 (S.D.N.Y.1998). The Second Circuit has not expressly ruled that the ADA permits a hostile work environment claim based on disability, however several courts in this district have recognized such claims. *McGrath v. Thomson Reuters,* 2012 WL 2119112, at *15–16 (S.D.N.Y.2012).

*21 To succeed on a claim for hostile work environment, plaintiff must establish: "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer". *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). The standard for establishing a hostile work environment is high, *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003), and a claim cannot be based upon vague, unsupported allegations. *Thomas v. Bergdorff Goodman, Inc.,* 2004 WL 2979960, at *7 (S.D.N.Y.2004).

Plaintiff must prove both objective and subjective elements, i.e., that the conduct alleged is so severe and pervasive as to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive. *Harris v. Forklift Sys., Inc.,* 510 U.S. at 22. The Supreme Court has held that a work environment's hostility should be assessed based on the "to-

tality of the circumstances". *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007) (citing *Harris,* 510 U.S. at 23). Factors to consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.* With respect to the frequency of the alleged conduct, it is not only how long the conduct lasts, but also the offensiveness of the actions that should be considered in determining whether such actions are pervasive. *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 578 (2d Cir.1989). Isolated, minor episodes of harassment do not, however, merit relief. *See Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.1997); *see also Ferguson v. New York City Transit Auth.,* 2005 WL 3149524, at *9 (E.D.N.Y.2005) (holding that the plaintiff's claims, which occurred three months apart, were not severe or pervasive). "[I]solated incidents of offensive conduct," which do not demonstrate harassment of such a quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. *Petrosino v. Bell Atl.,* 385 F.3d 210, 223 (2d Cir.2004). However, even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace. *Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir.2000). A single incident must be extraordinarily severe to have altered the conditions of the plaintiff's environment. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000). On a summary judgment motion, the Court must consider the totality of the circumstances and evaluate the quantity, frequency, and severity of the incidents in order to obtain a realistic view of the work environment. *See Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999).

*22 Defendant claims that two meetings cannot be found to be hostile and that based upon Weiss' and Casey's sworn testimony, the tone of the June 1, 2009 meeting was one that should have been expected in a

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

work environment where there were differences of opinion. Defendant claims that Merendo, Weiss and Casey's all provide consistent accounts of the events. Moreover, VA privacy policy did not prohibit the exchange between Weiss and Dardaris. Conversely, plaintiff claims she was physically threatened and verbally abused by Weiss.

As the Court has noted throughout this opinion, the witnesses provide drastically different versions of the events that transpired in Weiss' office on June 1, 2009. Plaintiff testified:

> A. ... So the conversation got heated and I had to ask to leave the room to get some air. And she wouldn't let me leave. Finally I told her I don't want to be disrespectful, but I need to get out, I could feel the PTSD issues arising. And I had gotten good at recognizing that. And she got up and slammed the door and got pretty close in my face and just started yelling at me saying, well, now you are being disrespectful. And I don't really remember what happened after that.

> Pltf. Dep. at p. 21.

Weiss and Casey testified that the door was never closed and that plaintiff became angry during the course of the meeting. Both witnesses deny that Weiss was screaming at plaintiff or that plaintiff suffered any physical symptoms including shortness of breath.

Plaintiff also testified that she confronted Weiss on June 3, 2009 about Weiss' conversation with Dardaris and that Weiss became "upset" and the "tone of her voice got louder".

Even viewing the evidence in a light most favorable to plaintiff, based upon the record, no reasonable person would conclude that these two isolated instances involving Weiss raising her voice to plaintiff or becoming "upset" with plaintiff amounted to a workplace that "was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of plaintiff's work environment." *Elhanafy v. Shinseki,* 2012 WL 2122178, at *17 (E.D.N.Y.2012) (citing *Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003)). "[B]eing addressed in a loud, unprofessional tone during one meeting does not satisfy the requirement that the offensive conduct be severe and pervasive." *Atanus v. Perry,* 520 F.3d 662, 676 (7th Cir.2008). The record does not contain any evidence that Weiss demeaned or humiliated plaintiff at any other time. Moreover, as discussed, plaintiff has not provided any admissible, competent evidence to establish that any physical contact and/or altercation occurred between plaintiff and Weiss. Accordingly, the City is entitled to summary judgment and dismissal of plaintiff's hostile work environment claims under Title VII.

**E. CONSTRUCTIVE DISCHARGE**

Plaintiff claims that Weiss' threatening behavior on June 1, 2009 was so objectively intolerable that a reasonable person would have felt compelled to resign. "To establish a 'constructive discharge,' a plaintiff must show that the employer deliberately ma[de her] working conditions so intolerable that [she was] forced into an involuntary resignation." *Miller v. Batesville Casket Co., Inc.,* 312 F. App'x 404, 406 (2d Cir.2009) (citing *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993) (internal quotation marks omitted)). An employee who does not resign cannot claim constructive discharge. *Richmond–Hopes v. City of Cleveland,* 168 F.3d 490 (6th Cir.1998); *see also Roberts v. Unitrin Specialty Lines Ins. Co.,* 405 F. App'x 874, 879 (5th Cir.2010) (if an employee claims that she was terminated and asserts that she did not resign, any claim for constructive discharge claim lacks merit); *see also Punsal v. Mount Sinai Serv. of Mount Sinai Sch. of Med.,* 2004 WL 736892, at *8 (S.D.N.Y.2004).

**\*23** On the within motion, plaintiff presents conflicting arguments. To wit, in support of her inten-

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

tional discrimination claim, plaintiff "adamantly argues" that she was terminated. Conversely, in support of a claim of constructive discharge, plaintiff asserts that defendant's actions, "were so intolerable that a reasonable person could feel compelled to resign". Upon review of plaintiff's own sworn testimony, the Court finds that the record does not support a claim of constructive discharge. During her deposition, plaintiff continually testified that despite her emails to Peters, she did not plan to resign. Moreover, plaintiff emphasized that she only intended to leave for the day because she was "overwhelmed" by the events.

As plaintiff claims throughout her opposition to the motion and in her sworn statements that she was terminated, plaintiff cannot sustain a cause of action for constructive discharge. Accordingly, this portion of defendant's motion is granted.

### III. PLAINTIFF'S REQUESTS FOR RELIEF

#### A. Punitive Damages

In the complaint, plaintiff seeks an award of punitive damages. In *Barnes v. Gorman,* 536 U.S. 181 (2002), the Supreme Court held:

Because punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act.

This holding has consistently been applied by various Circuit Courts. Plaintiff disagrees and argues that punitive damages are available under the Rehabilitation Act. However, the caselaw that plaintiff relies upon pre-dates the Supreme Court holding in *Barnes. See Tolbert v. Queens Coll.,* 242 F.3d 58 (2d Cir.2001); *DeLeo v. City of Stamford,* 919 F.Supp. 70 (D.Conn.1995). The Court has reviewed the one case cited by plaintiff that post-dates Barnes, *Schmelzer ex*

*rel. Schmelzer v. New York,* 363 F.Supp.2d 453 (E.D.N.Y.2003), and finds that plaintiff misinterprets the holding. The Court stated, in the context of an analysis of Eleventh Amendment immunity:

The Second Circuit in *Garcia* held that suits seeking a monetary award from a state under Title II must show ill will or animus. The court explicitly noted that "actions by private individuals for injunctive relief for state violations of Title II have not been foreclosed by today's decisions." The court also held that New York did not waive its sovereign immunity when it accepted funds pursuant to Section 504, but that monetary damages can be had upon a showing of deliberate indifference. Garcia is generally inapplicable to the case at bar, except to the extent that Plaintiffs seek monetary damages. Plaintiffs have failed to prove deliberate indifference to support their claim under Section 504. While it is clear that the State is in noncompliance, Plaintiffs have not shown that such noncompliance is a result of anything other than a large number of appeals to the SRO. Plaintiffs' claims for injunctive relief are sustained.

**\*24** The district court continued:

In *Barnes v. Gorman,* 536 U.S. 181 (2002), the Supreme Court found that punitive damages are not available under the ADA and Rehabilitation Act in private suits. The Court did note that punitive damages are different in nature from compensatory or injunctive relief and did not in any way limit such forms of damages. It found that compensatory and injunctive damages are types that are generally available for breach of a contract. The Court used this analogy because the federal funding recipient is on notice, as is a party to a contract, that it may be subject to such forms of relief.

Accordingly, based upon the *Barnes* holding and it progeny, plaintiff's claim for punitive damages is

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229
**(Cite as: 2012 WL 3685954 (N.D.N.Y.))**

dismissed.

## B. Reinstatement

"The Rehabilitation Act makes available in disability discrimination cases the remedies authorized by Title VII of the Civil Rights Act of 1964, see 29 U.S.C. § 794a(a)(1), and Title VII, in turn, provides that a court may order 'affirmative action ... which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate' ". *Lussier v. Runyon,* 50 F.3d 1103, 1107 (1st Cir.1995) (citing 42 U.S.C. § 2000e–5(g)); *see also Frye v. Aspin,* 997 F.2d 426, 428 (8th Cir.1993) (if successful, a Rehabilitation Act plaintiff is entitled to the equitable remedy of reinstatement).

In the complaint, plaintiff seeks, "[a]ll appropriate equitable relief, including but not limited to a suitable position with the VA ...". Defendant claims that plaintiff is not entitled to this relief because she has been receiving Social Security Disability payments since 2009. Plaintiff claims that she may, some time in the future, be able to hold a full time job. Moreover, plaintiff testified that currently, she could perform an administrative-type position if she was given accommodations with respect to transportation and placement in an office where she would be sitting. As discussed in Part II(A)(2)(a), the fact that plaintiff is receiving Social Security Disability is not dispositive in terms of her ability to perform her job. Accordingly, defendant's motion to dismiss plaintiff's claim for reinstatement is denied.

## CONCLUSION

**It is hereby**

**ORDERED** that defendant's motion for summary judgment and dismissal (Dkt. No. 20) of plaintiff's hostile work environment claims is **GRANTED;** it is further

**ORDERED** that defendant's motion for summary judgment and dismissal (Dkt. No. 20) of plaintiff's claim of constructive discharge is **GRANTED;** it is further

**ORDERED** that defendant's motion to dismiss plaintiff's claim (Dkt. No. 20) for punitive damages under the Rehabilitation Act is **GRANTED;** it is further

**ORDERED** that defendant's motion for summary judgment and dismissal of plaintiff's intentional discrimination claims is **GRANTED IN PART AND DENIED IN PART** consistent with the provisions of this Order; it is further

**\*25 ORDERED** that defendant's motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 20) is **DENIED** in all other respects.

**ORDERED** that a Settlement Conference is scheduled in this matter for November 13, 2012 at 10:00 A.M. in Albany. The parties are directed to appear at that time and make submissions in advance of the conference as directed in this Court's Order Setting Settlement Conference which will be forthcoming.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.
Lupe v. Shinseki
Not Reported in F.Supp.2d, 2012 WL 3685954 (N.D.N.Y.), 26 A.D. Cases 1688, 45 NDLR P 229

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3643839 (N.D.N.Y.), 26 A.D. Cases 1708, 45 NDLR P 211
**(Cite as: 2012 WL 3643839 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Michael TROEGER, Plaintiff,
v.
ELLENVILLE CENTRAL SCHOOL DISTRICT,
Defendant.

No. 1:10–cv–718 (GLS/DRH).
Aug. 23, 2012.

Sussman, Watkins Law Firm, Michael H. Sussman, Esq., Goshen, NY, of Counsel, for the Plaintiff.

Drake, Loeb Law Firm, Adam L. Rodd, Esq., Ralph L. Puglielle, Jr., Esq., of Counsel, New Windsor, NY, for the Defendant.

### *MEMORANDUM–DECISION AND ORDER*
GARY L. SHARPE, Chief Judge.
#### I. *Introduction*
**\*1** Plaintiff Michael Troeger commenced this action against the Ellenville Central School District ("the District"), alleging multiple violations of the Americans with Disabilities Act (ADA).[FN1] (*See* Compl., Dkt. No. 1.) In a May 8, 2012 Memorandum–Decision and Order, this court granted in part and denied in part the District's motion for summary judgment. (*See* Dkt. No. 25.) As a result of that Order, Troeger's only remaining claim alleges failure by the District to accommodate his disability between November 7, 2007 and the end of the 2007–08 school year. (*See id.*) Pending is the District's motion for reconsideration. (*See* Dkt. No. 28.) For the reasons that follow, the motion is granted and Troeger's remaining claim is dismissed.

FN1. 42 U.S.C. § 12101 *et seq.*

#### II. *Standard of Review*
"In order to prevail on a motion for reconsideration, the movant must satisfy stringent requirements." *In re C–TC 9th Ave. P'ship v. Norton Co.,* 182 B.R. 1, 2 (N.D.N.Y.1995). Such motions "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). The prevailing rule "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. at 3 (citation omitted). "[A] motion to reconsider should not be granted where the moving party seeks solely to re[-]litigate an issue already decided." *Shrader,* 70 F.3d at 257.

#### III. *Discussion*
The District contends that reconsideration is appropriate here for the purpose of correcting clear legal error in the court's underlying disability analysis. (*See* Dkt. No. 28, Attach. 2 at 4–10.) Specifically, it avers that the court erred, as a matter of law, in finding that a genuine factual dispute existed as to whether Troeger suffered a substantial limitation of a major life activity between November 7, 2007 and the end of the 2007–08 school year. (*See id.*) Upon reconsideration, the court agrees.

Under the ADA, "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities ...; (B) a record of such an

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3643839 (N.D.N.Y.), 26 A.D. Cases 1708, 45 NDLR P 211
**(Cite as: 2012 WL 3643839 (N.D.N.Y.))**

impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Allegations of disability advanced under the first method require of the plaintiff: (1) a showing that he suffers from a physical or mental impairment; (2) identification of the supposedly-impaired major life activity; and (3) demonstration of substantial limitation of that activity. *See Duttweiler v. Eagle Janitorial, Inc.,* No. 5:05–CV–0886, 2009 WL 1606351, at *18 (N.D.N.Y. June 4, 2009).

**\*2** For purposes of the ADA, a physical impairment is " '[a]ny physiological disorder, or condition ... affecting one or more of the following body systems: neurological [or] musculoskeletal.' " *Francis v. City of Meriden,* 129 F.3d 281, 283 (2d Cir.1997) (quoting 29 C.F.R. § 1630.2(h)(1)). "[M]ajor life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," as well as "sitting, standing, lifting, [and] reaching." *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 870 (2d Cir.1998) (internal quotation marks and citations omitted). Substantial limitation occurs where a plaintiff is "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to ... the average person." *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)). A proper substantial limitation analysis considers: "the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Capobianco v. City of N.Y.,* 422 F.3d 47, 57 (2d Cir.2005).

The physical impairment underlying Troeger's claim is a back injury which originated in 2004 and was allegedly exacerbated in October 2005. (*See* Def.'s Statement of Material Facts (SMF) ¶¶ 6, 23–25, Dkt. No. 12, Attach. 15.) After narrowing the disability determination to the question of substantial limi-

tation,[FN2] the court, in its May 8 Order, erroneously found that a genuine issue of fact existed as to whether Troeger was substantially limited in his ability to perform the recognized major life activities of, *"inter alia,* lift[ing], sit[ting], stand[ing] and work[ing]." (Dkt. No. 25 at 13.)

> FN2. Because Troeger argues only that his disability is the result of a physical impairment that substantially limits certain major life activities, (*see* Compl.; Dkt. Nos. 14, 30), the court does not analyze the possible viability of his ADA claim under 42 U.S.C. § 12102(1)'s "record of" or "regarded as" theories of disability.

**A.** *Lifting*

Although a determination of substantial limitation is fact specific, *see Ryan,* 135 F.3d at 872, certain lifting restrictions have been found by a number of courts to be, as a matter of law, insufficient. *See, e.g., Cortes v. Sky Chefs, Inc.,* 67 F. App'x 66, 68 (2d Cir.2003) (finding a ten pound lifting restriction insubstantial); *McDonald v. City of N.Y.,* 786 F.Supp.2d 588, 609 (E.D.N.Y.2011) (same, for twenty pounds); *Glozman v. Retail, Wholesale & Chain Store Food Emps. Union, Local 338,* 204 F.Supp.2d 615, 621 (S.D.N.Y.2002) (same, for ten pounds); *see also Colwell v. Suffolk Cnty. Police Dep't,* 158 F.3d 635, 644 (2d Cir.1998), *superseded on other grounds* by 42 U.S.C. 12102(3)(A), (finding insubstantial the inability of respective plaintiffs to lift "very heavy objects" or "anything heavy").[FN3]

> FN3. While speculation exists as to whether similar lifting restrictions may be sufficient to establish a disability under the ADA Amendments Act of 2008 (ADAA), *see Farina v. Branford Bd. of Educ.,* No. 3:09–CV–49, 2010 WL 3829160, at *11 (D.Conn. Sept. 23, 2010), the ADAA, which became effective on January 1, 2009, does not apply retroactively, and is therefore in-

Not Reported in F.Supp.2d, 2012 WL 3643839 (N.D.N.Y.), 26 A.D. Cases 1708, 45 NDLR P 211
**(Cite as: 2012 WL 3643839 (N.D.N.Y.))**

applicable to the instant analysis, *see Stephan v. West Irondequoit Cent. Sch. Dist.,* 450 F. App'x 77, 79 n. 1 (2d Cir.2011).

On November 17, 2006, approximately one year before the start of the relevant time period, orthopaedic surgeon Paul Jones opined in a school-ordered independent medical examination that Troeger "could work if he avoided bending and lifting more than about 10–15 pounds." (Dkt. No. 16, Attach. 18 at 2–4.) Troeger's physician, Dr. Megan McMullan, later indicated, in November 2007, that he "should be limited to lifting less than 20 pounds." (Dkt. No 16, Attach. 21 at 2.)

**\*3** Because Troeger's lifting limitations fall within the range of restrictions which have been deemed insufficient as a matter of law, he has failed to establish a substantial limitation of the major life activity of lifting.

**B. *Sitting and Standing***

Much like with lifting, "the inability to sit or stand for an extended duration does not amount to a substantial limitation on a major life activity." *Glozman,* 204 F.Supp.2d at 622. Although "a single benchmark against which to test all sitting limitations" has yet to be established, "courts have generally found that the inability to sit for periods of an hour or less may constitute a substantial limitation on the ability to sit, while the ability to sit for periods longer than an hour does not." *Equal Emp't Opportunity Comm'n v. Yellow Freight Sys., Inc.,* No. 98 CIV. 2270, 2002 WL 31011859, at \*13 (S.D.N.Y. Sept. 9, 2002).

On August 24, 2006, Janet Tamai, Doctor of Osteopathic Medicine, opined that Troeger should engage in "no prolonged sitting, standing, walking, climbing [or] bending." (Dkt. No. 16, Attach. 9 at 2.) Following a request for clarification from District superintendent Lisa Wiles, (*see* Dkt. No. 16, Attach. 17 at 5), Dr. Tamai explained that " '[p]rolonged' in

this case is over [twenty] minutes," and that Troeger was "unable to climb [two] flights of stairs," and "should be able to stand up or sit down when he feels it is necessary to avoid back strain," (Dkt. No. 16, Attach. 10 at 2). One year later, and before the time period at issue here began, however, Dr. McMullan—who "cared for [Troeger's] back condition with Dr. Tamai's help," (Dkt. No. 16, Attach. 21 at 2)—reported that he had "no significant restrictions on ... walking, standing, sitting or climbing stairs," (Dkt. No. 16, Attach. 23 at 2).

Dr. McMullan's explicit finding in October 2007 that Troeger had no significant restrictions on standing or sitting precludes a finding of a substantial limitation of those major life activities during the relevant time period.

**C. *Working***

To establish substantial limitation of the major life activity of working, it is not enough for a plaintiff to show " '[t]he inability to perform a single, particular job.' " *Cameron v. Cmty. Aid for Retarded Children, Inc.,* 335 F.3d 60, 65 (2d Cir.2003) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). Instead, a plaintiff must be " 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' " *Wernick v. Fed. Reserve Bank of N.Y.,* 91 F.3d 379, 383 (2d Cir.1996) (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

In September 2007, Dr. McMullan opined that Troeger could "return to work in a capacity ad lib from part to full time." (Dkt. No. 16, Attach. 21 at 2.) In a follow-up letter, she clarified that he should be started "at unrestricted duty part time ( [twenty] hours a week) and increase to full time rapidly if he tolerates this position without significant aggravation of symptoms." (Dkt. No. 16, Attach. 23 at 2.) Dr. McMullan further instructed that Troeger's "office setting should be optimized for back health, including ergonomic chair and desk setting," and that in addition

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3643839 (N.D.N.Y.), 26 A.D. Cases 1708, 45 NDLR P 211
**(Cite as: 2012 WL 3643839 (N.D.N.Y.))**

to the twenty-pound lifting restriction noted above, efforts should be "made to prevent him from having to physically restrain students." (Dkt. No. 16, Attach. 21 at 2.) Following his forced absence for the entirety of the 2006–07 school year—the reason for which is disputed, (*see* Pl.'s Statement of Material Facts (SMF) ¶ 48, Dkt. No. 15; Dkt. No. 16, Attach. 17 at 2)—Troeger returned to his position as a school counselor on the first day of the relevant time period, November 7, 2007, (*see* Dkt. No. 17 ¶ 8). Consistent with Dr. McMullan's requests, Troeger initially returned to work on a part time basis,[FN4] (*see* Dkt. No. 12, Attach. 12 at 43), but worked continuously full time for the remainder of the 2007–08 school year through the 2011–12 school year,[FN5] (*see* Dkt. No. 12, Attach. 14 at 9).

> FN4. Troeger makes no argument that his initial return to employment on a part time basis constituted a substantial limitation of his ability to work. In any event, such an argument would be unavailing. *See Zurenda v. Cardiology Assocs., P.C.,* No. 3:10–CV–0882, 2012 WL 1801740, at *8 (N.D.N.Y. May 16, 2012) (holding that an employee who, at the time of her discharge worked part time, was not substantially limited in the major life activity of working); *see also Emmons v. City Univ. of N. Y.,* 715 F.Supp.2d 394, 409 (E.D.N.Y.2010) ("[S]hort term, temporary restrictions are not substantially limiting and do not render a person disabled within the meaning of the ADA.") (internal quotation marks and citation omitted).

> FN5. Although not directly related to the back impairment on which Troeger bases his disability allegations, it should be noted that, in an October 2007 evaluation requested by the District, Psychologist Richard Ovens indicated that Troeger showed no evidence of being psychologically unfit to perform the duties of a school counselor, and that he "should return to work as soon as he is medically approved to do so." (Dkt. No. 12, Attach. 14 at 42–44.)

**\*4** As Troeger admits to performing his job as a school counselor—allegedly without the requested ergonomic chair accommodation—throughout the entire relevant time period and beyond, he has failed to show significant restriction in his ability to perform a single, specific job, let alone the requisite class or broad range of jobs. *See Colwell,* 158 F.3d at 644–45 (requiring proof of "the kinds of jobs from which [an] impaired individual is disqualified," and finding "general restrictions imposed by [plaintiff's] doctor" to be insufficient to show significant restriction). Accordingly, Troeger has failed to establish a substantial limitation of the major life activity of working.

Because Troeger did not experience a substantial limitation of any major life activities during the relevant time period, he is not disabled under the ADA. *See Duttweiler,* 2009 WL 1606351, at *18. Accordingly, he has failed to establish a *prima facie* failure-to-accommodate case, and his remaining claim must be dismissed. *See Rodal v. Anesthesia Grp. of Onondaga, P. C.,* 369 F.3d 113, 118 (2d Cir.2004).

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that the District's motion for reconsideration (Dkt. No. 28) is **GRANTED;** and it is further

**ORDERED** that Troeger's remaining failure-to-accommodate claim for the period between November 7, 2007 and the end of the 2007–08 school year is **DISMISSED;** and it is further

**ORDERED** that Troeger's Complaint (Dkt. No. 1) is **DISMISSED;** and it is further

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3643839 (N.D.N.Y.), 26 A.D. Cases 1708, 45 NDLR P 211
**(Cite as: 2012 WL 3643839 (N.D.N.Y.))**

  **ORDERED** that the Clerk close this case; and it is further

  **ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

  **IT IS SO ORDERED.**

N.D.N.Y.,2012.
Troeger v. Ellenville Cent. School Dist.
Not Reported in F.Supp.2d, 2012 WL 3643839 (N.D.N.Y.), 26 A.D. Cases 1708, 45 NDLR P 211

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.